**AERONAUTICAL INDUS. DIST. LODGE 91 OF THE INT'L ASS'N OF MACHINISTS AND AEROSPACE WORKERS, AFL—CIO, Plaintiff,**

v.

**UNITED TECHNOLOGIES CORP., PRATT & WHITNEY, Defendant.**

No. Civ.A.3:99CV1827 (JCH).

United States District Court, D. Connecticut.

Feb. 18, 2000.

Gregg D. Adler, Livingston, Adler, Pulda & Meiklejohn, Hartford, CT, for Aeronautical Industrial District Lodge 91 of the International Assoc. of Machinists and Aerospace Workers, AFL—CIO, plaintiff.

Henry A. Platt, Gary L. Lieber, Anessa Abrams, Schmeltzer, Aptaker & Shepard, Washington, DC, Edward J. Dempsey, United Technologies Corp., Hartford, CT, for United Technologies Corp. Pratt & Whitney Division, defendant.

## OPINION

HALL, District Judge.

Aeronautical Industrial District Lodge 91 of the International Association of Machinists and Aerospace Workers, AFL—CIO ("the Union") brings this action against United Technologies Corporation, Pratt & Whitney ("Pratt"), alleging that Pratt's proposed restructuring violates the parties' collective bargaining agreement ("CBA") in two respects. First, the Union claims that Pratt's plans to transfer work out of Connecticut violate Letter 22 of the CBA, which letter provides that Pratt will make "every effort" to keep certain work within the bargaining unit. The Union also claims that Pratt's plan to transfer all but 100 bargaining unit employees out of its North Haven facility before the expiration of the CBA violates its implied covenant of good faith and fair dealing. The case was tried to the court on January 10 and January 14, 2000, and final post-trial submissions were received on February 1, 2000.

Based upon the following findings of fact and conclusions of law, the court finds for the Union on its claim that Pratt failed to make "every effort" to keep work within the bargaining unit and against it on its claim that Pratt breached the implied covenant of good faith and fair dealing.[1]

### FINDINGS OF FACT

*The Parties.* Pratt manufactures and repairs jet engines and their component parts for about 370 major customers, mostly airlines, around the world. Pratt has two main divisions: OEM, which manufactures and sells new jet engines, compo-

---

1. The parties agreed that the hearing on the preliminary injunction would be the trial on the merits. F.R.Civ.P. 65(a)(2).

---

nents and parts; and Engine Services, which overhauls jet engines and repairs them and their component parts. The business of Engine Services, which encompasses parts repair work, has been growing steadily over the past few years. It made a $61 million profit in 1998 and a $106 million profit in 1999. It is projected to be the key part of Pratt's profit plan going forward. All of this work, with the exception of minor repairs done at the Cheshire facility, is moving to locations outside of Connecticut pursuant to a restructuring plan announced by Pratt in August 1999.

The Union is a bargaining unit represented by District 91 and affiliated local lodges made up of production and maintenance employees at Pratt's Connecticut facilities, including workers located in and around East Hartford, Middletown, North Haven, Cheshire, Manchester and Rocky Hill.[2]

***The Current Collective Bargaining Agreement.*** The parties have had a collective bargaining relationship for over 50 years. Their current collective bargaining agreement ("CBA") is in effect from October 8, 1998 through December 2, 2001.

The CBA includes the following relevant provisions. Article 1, entitled "Management Functions," provides:

> It is recognized that in addition to other functions and responsibilities, the Company has and will retain the sole right and responsibility to direct the operations of the Company and in this connection to determine the number and locations of its plants; the product to be manufactured; the types of work to be performed; the assignment of all work

to employees or other persons ... unless otherwise herein provided.

Article 27 details the procedural requirements that Pratt has agreed to follow if it intends "to close a plant or transfer a business unit, department, cell, or any part of an operation." A minimum of six months notice is required, unless there are "extreme business conditions." Once notice is given, the Union has a 45–day period in which to "meet and confer" with Pratt to attempt to change Pratt's position. Article 27 also provides: "The final decision regarding closing a plant or transferring a business unit rests solely with the Company."

Article 7 provides for mandatory arbitration of grievances, with the exception of grievances arising under Articles 1 and 27.

The CBA includes thirty-six Letters of Agreement, which embody various agreements between the Union and Pratt. These Letters are an integral part of the CBA. Letter 22, entitled "Workplace Guarantees and Subcontracting," states in relevant part:

> The Company agrees during the life of this Agreement that it will continue to employ bargaining unit members at its facilities in East Hartford, Middletown, North Haven and Cheshire.

> The Company will make every effort to preserve the work that is presently and normally manufactured by employees covered by Article 2 of this Agreement. Therefore, it is not the intent of the Company to use subcontractors for the purpose of reducing or transferring work that is presently and normally manufactured by employees in the bargaining unit nor to place such work in Maine or Georgia, except when ...

---

2. Members include "inspectors, crib attendants, material handlers, factory clerks (or plant clericals), trainees, apprentices, expediters and working leaders, but excluding timekeepers, engineering and technical employees, laboratory technicians, foremen's clerks, salaried office and clerical employees, medical department employees, plant protection employees, executives, plant superintendents, division superintendents, general foremen, foremen, assistant foremen, group supervisors, watch engineers, and all other supervisory employees with authority to hire, promote, discharge, discipline or otherwise effect changes in the status of employees, or effectively recommend such action." CBA (1998), Art. 2.

As Pratt's Vice President for Human Resources and Organization testified, Letter 22 includes promises concerning moving work and subcontracting as well as a promise to preserve work normally and presently performed by Article 2 employees. Letter 22 expressly provides that "disputes concerning workplace guarantees and subcontracting are not subject to the grievance procedure including arbitration." [3] Differences that arise over such issues are to be "referred to and discussed by the Executive Steering Committee" ("ESC") at its next regularly scheduled meeting.[4] In referring differences under Letter 22 to the ESC, the parties did not provide that the ESC is empowered to make any decisions as to whether Pratt has violated any terms of the contract, nor does it establish any procedure for conducting hearings, voting or otherwise determining disputes. Most significantly, the CBA does not provide that decisions rendered by the ESC regarding workplace guarantees or subcontracting are final and binding. Letter 22 does not provide that the parties exclude judicial resolution of disputes that arise under Letter 22.

***The 1998 Negotiations.*** Prior to commencement of negotiations for the 1998 CBA, Pratt's parent company, United Technologies Corporation ("UTC"), acquired two companies engaged in parts repair manufacturing work: Interturbine's Flight Repair Group, located in Dallas and Singapore; and Howmet, located in Texas, Oklahoma and North Haven. The Howmet North Haven facility became known as Advanced Refurbishment Operation (ARO). The employees in that facility eventually became part of the bargaining unit represented by District 91, although they started at a lower wage and had a longer wage progression than other bar-

gaining unit members. Pratt planned to move the turbine airfoil repairs work ("ART"), consisting of 188 bargaining unit jobs, from its main plant in North Haven into the Howmet plant.

Negotiations for the 1998 CBA began on September 22, 1998, approximately two months earlier than usual. These negotiations occurred in a positive climate: bargaining unit employment levels had risen significantly over the prior three years and 1998 was one of the most profitable years in Pratt's history. Pratt indicated to the Union, however, that there were production schedule problems and that Pratt expected to have a "surplus" of approximately 1000–1300 bargaining unit jobs through the year 2000. Pratt sought early negotiations in exchange for discussing an enhanced voluntary early retirement package to address the surplus. The negotiations were less acrimonious than had been the case in the recent past, and the parties were able to reach an early settlement.

As part of the 1998 negotiations, the Union proposed bringing the wages at Pratt's ARO Howmet into parity with the bargaining unit wages paid at Pratt's other Connecticut facilities. Pratt's business representatives told the Union that, if the Union was serious about that proposal, Pratt would have to review its strategy with respect to ARO work. During the 1998 contract negotiations, the Union proposed that the Talon and ARO facilities be added to the workplace guarantees language of Letter 22. Pratt declined to do so, indicating that it was not prepared to make the same type of commitment on those facilities as it could regarding the other four plants. Pratt did, however, agree to continue its guarantees regarding the East Hartford, North Haven, Middle-

---

**3.** There is no dispute that the matters at issue in this lawsuit are not arbitrable.

**4.** Described in Letter 21 of the CBA, the Executive Steering Committee consists of the Union's Directing Business Representative and Assistant Directing Business Representative, and the Pratt's Executive Vice–President for

Operations and Vice President of Human Resources for Operations. Its purpose is to facilitate communications between the parties "concerning the issues of job security, productivity, work force flexibility, training and cost reduction."

town and Cheshire facilities, and at no time suggested that there was any uncertainty with respect to the future of those facilities.

The 1998 negotiations also resulted in an alternative work schedule for the Cheshire overhaul facility. Pratt had sought the alternative schedule based on a need to improve Cheshire's turn times. Pratt told the Union that if an alternative work schedule was not implemented in Cheshire, Pratt would remove the Cheshire facility from Letter 22's workplace guarantees provision. The Union agreed to an alternative work schedule and Cheshire's turn times have improved.

During the negotiations, the Union questioned Pratt representatives about whether and what kind of restructuring might occur. Pratt told the Union it had canceled plans to move the 188 ART workers from North Haven to the ARO Howmet plant. Pratt did not discuss any other restructuring plans with the Union during negotiations.

The Union negotiators expressed their concern over losing 1000 jobs from the bargaining unit. Pratt assured them that the current situation was not a "repeat of 1993," when business exigencies threatened to lay off thousands of workers. Pratt told the Union negotiators that the Union would see work "gravitating to Connecticut," specifically mentioning work coming in from Maine and Florida. Toward the close of the final bargaining session, Pratt reiterated to the Union negotiators that Pratt was "committed to Connecticut."

*The 1999 Announcement.* On or about January 14, 1999, pursuant to an agreement included in Letter 33 of the CBA, Pratt informed District 91 that it planned to close the former Howmet repair facility in North Haven, and the work performed by bargaining unit employees in that plant would be relocated to Oklahoma and Texas.

On or about June 29, 1999, Pratt & Whitney informed District 91 that it was going to close the Pratt Talon repair facility in Rocky Hill, and that the work performed by bargaining unit employees in that plant would be relocated to a Pratt facility in Dallas, Texas.

On August 12 and 19, 1999, Pratt announced that it was implementing a major restructuring with the objectives to "eliminate excess space, reduce costs and streamline operations." As part of the restructuring, Pratt plans to move parts repair work out of Connecticut by December 2000. Specifically, Pratt plans to move the turbine airfoil repair work, performed by 188 employees working in the North Haven plant, and the parts repair work, performed by 319 employees located in "M Building" in the East Hartford plant, to facilities in Arkansas, Texas, and/or Oklahoma. Parts repair work has been performed in Connecticut by the Union's members for decades.

Pratt further announced that it plans to move its turbine airfoils operations (approximately 971 jobs) from its North Haven plant to its facilities in East Hartford, which are covered by the CBA. Unlike the parts repair work going out of state, this work will remain in the bargaining unit covered by Article 2 of the CBA.

The North Haven and East Hartford plants are covered by the workplace guarantees provision in Letter 22 of the current CBA. As of August 12, 1999, the parts repair manufacturing work that will be removed from the bargaining unit and relocated to Pratt facilities outside of Connecticut constituted work "presently and normally manufactured by employees covered by Article 2" of the 1998 CBA.

These moves will be made in stages over the next few years. Through a combination of the removal of the turbine airfoil parts repair work and the transfer of the turbine airfoil operations, Pratt plans to close the North Haven plant sometime shortly after the expiration of the current CBA. Pratt anticipates that there will be

approximately 100 bargaining unit employees left working in the North Haven plant on December 2, 2001, when the CBA expires. If all goes according to the restructuring plan, all bargaining unit jobs will be eliminated from that facility by the end of 2001.

### Collective Bargaining History

*1991 Negotiations.* Article 27 of the CBA first became part of the CBA in 1991. During the 1991 negotiations, the Union had proposed that the "meet and confer" process in Article 27 be subject to arbitration. Pratt rejected this proposal. In 1991, the Union also proposed the following:

> It is agreed to by the parties that the Company will make every effort to preserve the work presently being performed by employees covered under Article II of this agreement.

> It is not the intention of the Company to use subcontractors for the purpose of reducing or transferring work that is normally performed by employees in the bargaining unit.

> Section 1. The Company agrees that it will not subcontract work presently and normally performed by bargaining unit employees except under the following circumstances. . . .

The proposed provision also sought the formation of a joint committee that would seek to bring back work formerly performed by the bargaining unit that was being performed by outside vendors or subcontractors. This proposal was also rejected by Pratt.

The 1991 negotiations resulted in a three-year contract with a term of December 9, 1991 through December 4, 1994.

*1993 Mid–Contractual Renegotiations.* In 1993, however, Pratt announced that, due to business exigencies, the Pratt was going to lay off in excess of 2000 employees and move work outside of the bargaining unit. Pratt advised the Union that the only way this scenario could be avoided was for the Union to renegotiate and agree to economic modifications of the 1991–1994 CBA. Pratt's stated position was that labor costs associated with bargaining unit work were substantially higher than other Pratt-owned facilities. The Union agreed to engage in mid-term negotiations.

Pratt and the Union renegotiated the CBA in May and June 1993. In return for granting substantial economic concessions, the Union sought a total prohibition on transferring work outside of the collective bargaining unit and subcontracting, except in very limited circumstances. One of the Union's proposal was entitled "Job Security." It provided:

> In recognizing that employees are the most valuable asset of the company and it is employees who develop new technologies and systems and employees who make the systems work in order for the company to be competitive and profitable. It is agreed to by the parties that the company will preserve the work presently being performed by employees covered under Article II of this agreement. It is further agreed that work that is presently being performed within the CONNOPS Plants will not be transferred to other Pratt & Whitney Plants that are not covered by a collective bargaining agreement with District Lodge 91.

This proposal was rejected by Pratt.

Pratt and the Union eventually entered into the "Joint Agreement of Job Security, Productivity and Cost Reduction." In addition to extending the current CBA one year to December 1995, the Joint Agreement provided for a cancellation of the December 1993 wage increase for bargaining unit members, suspension of COLA payments, changes in health insurance benefits consisting of employee contributions to the cost of the insurance, a freeze on automatic progression increases, and the institution of productivity milestones, which, if not met, would result in wage reductions.

In return, Pratt agreed to certain workplace guarantees and subcontracting limitations. Section 2 of the Joint Agreement, "Workplace Guarantees," provided:

> The Company agrees during the life of this Joint Agreement it will continue to employ bargaining unit members at its facilities in East Hartford, Middletown, North Haven, and Cheshire. Among these facilities, the Company will continue to perform parts manufacturing, inspection, assembly and test of aircraft engines, parts repair, overhaul of aircraft engines, development operations and experimental assembly and test of aircraft engines.

The "Subcontracting" provision, Section 3, stated, in relevant part:

> [T]he Company agrees, as a limitation on its contractual rights set forth in Article I and elsewhere in the collective bargaining agreement, it will take no action to subcontract work presently and normally manufactured by bargaining unit employees nor to place such work in Maine or Georgia, except when ... [5]

The non-arbitrability provision of Section 9 of the Joint Agreement was raised during the last several days of the 1993 negotiations. The Union's representative explained that the proposed Joint Agreement would not be recommended by a majority of the Local Lodge Officers participating in the negotiations unless they could be assured that the promises concerning workplace guarantees and subcontracting would be enforceable. This was significant because there was a high level of employee distrust of Pratt during this time, and it was important that the Union have the ability to take action in the event Pratt failed to abide by its job security promises.

Pratt continued to refuse to make disputes concerning the workplace guarantees subject to arbitration. Pratt's representative did tell the Union that it had other avenues available to it if such disputes arose. The Union reasonably understood that to mean the Union could seek NLRB or judicial remedies.

After receiving this assurance from Pratt, Union lead negotiators Andrew Romegialli and James Parent met with the Presidents of the four Local Lodges. The Union's lead representative, Mr. Romegialli, informed the Local Lodge Presidents that, even though the disputes about the job security promises would not be arbitrable, the Union would still have other remedies available if Pratt were to violate those provisions, and that the Union could take legal action if necessary to enforce the contract. This was a pivotal factor in getting the Presidents to recommend acceptance of the Joint Agreement.

*1995 Negotiations.* The parties next met in regular collective bargaining negotiations in 1995. The Union made several proposals. One of these proposals, entitled "Bargaining Unit Preservation," repeated some of the themes from earlier negotiations:

> It is agreed to by the parties that the Company will make every effort to preserve the work presently being performed by employees covered under Article II of this Agreement.

> It is not the intent of the Company to use subcontractors for the purpose of reducing or transferring work that is normally performed by employees in the bargaining unit.

The proposal also stated that "the Company agrees that it is not to subcontract

---

5. The Union was aware that the workplace guarantees provision did not create an obligation on Pratt's part to preserve a fixed minimum number of bargaining unit jobs. In a newsletter circulated to bargaining unit employees while the workplace guarantees provision was on the table, the Union stated, in relevant part:

P & W's current offer "guarantees" that they will operate the East Hartford, North Haven, Middletown and Cheshire facilities and employ workers on a variety of tasks through 1996. But it doesn't say how many workers. Not much of a guarantee, except to some bricks and mortar.

work presently and normally performed by bargaining unit employees," that Pratt would not lay off employees as a direct result of subcontracting, and that Pratt and Union representatives would form a committee to bring back work formerly performed by bargaining unit employees that was being performed by outside vendors or subcontractors. Pratt rejected this proposal.

Another Union proposal rejected by Pratt sought to modify the "Workplace Guarantees" of the 1993 Joint Agreement by setting the then current employment level as a minimum population level at its facilities in East Hartford, Rocky Hill, Middletown, North Haven, and Cheshire. The Union also proposed that "[t]he Company further agrees it will take no action to subcontract work presently manufactured by bargaining unit employees or to place such work in Maine or Georgia. . . ." The Union also wanted to have disputes arising out of the aforementioned referred first to the ESC, and then, if unresolved, to arbitration. The Union again sought to have the "meet and confer" disputes under Article 27 be subject to arbitration. This was also rejected by Pratt.

Instead, the 1995 negotiations led to "Letter 23," which provided in part:

This is to confirm the following understanding and agreement . . . concerning workplace guarantees and subcontracting . . .

The Company agrees during the life of this agreement that it will continue to employ bargaining unit members at its facilities in East Hartford, Middletown, North Haven, and Cheshire.

It is also agreed to by the parties that the Company will make every effort to preserve the work presently and normally manufactured by employees covered by Article II of the agreement. Therefore, it is not the intent of the Company to use subcontractors for the purpose of reducing or transferring

work that is presently and normally manufactured by employees in the bargaining unit nor to place such in Maine or George, except . . .

Letter 23 was drafted by Pratt.[6] It also provided that disputes concerning workplace guarantees and subcontracting are not subject to the grievance procedure, including arbitration, but are instead to be referred to the ESC for discussion at its next regularly scheduled meeting.

Letter 23 ultimately became Letter 22 after the 1998 negotiations. The provisions relevant to this lawsuit did not change except for the deletion of the opening clause of the second paragraph. Letter 23 had read: "It is also agreed by the parties that the Company will make every effort to preserve the work presently and normally manufactured by employees covered by Article II of the agreement." Letter 22 read simply: "The Company will make every effort to preserve the work presently and normally manufactured by employees covered by Article 2 of this Agreement."

***Impact of Restructuring.*** Pursuant to the announced restructuring, all parts repair work, with the exception only of minor repairs to be done at the Cheshire facility, is moving to locations outside of Connecticut and thus outside the CBA. The parts repair manufacturing work that will be removed from the bargaining unit and relocated to Pratt facilities outside Connecticut constitutes "work presently and normally manufactured by employees covered by Article 2" of the 1998 CBA. None of the work in question is moving to Maine or Georgia.

The strategic planning process that resulted in the restructuring decisions announced during the summer of 1999 had commenced shortly after the negotiations ended. With respect to the parts repair manufacturing functions, Pratt developed a business strategy to move the work closer

---

**6.** Although bits of it came from prior Union proposals, former Pratt Vice President James McMahon testified that Pratt employees working for him drafted Letter 23.

to the customer base, eliminate excess floor space, and streamline operations by moving the operations to locations outside of Connecticut where the overall costs of doing business—including labor costs—are lower.

In deciding how to restructure, Pratt made no effort to preserve the parts repair work presently and normally manufactured by bargaining unit employees in its East Hartford and North Haven plants. Indeed, the manager with primary responsibility for Pratt's parts repair operations, the Vice President of Engine Services, admitted that preservation of that work for employees covered by the CBA was not considered as a factor in the decision-making process. Instead, Pratt set out to achieve an approximate 30 percent reduction in costs. In evaluating its choices, Pratt rejected options that did not achieve this level of reduction. Its decision was made based on a desire to grow the business and maximize profits, making no distinction between employees within the bargaining unit and employees outside the bargaining unit. Pratt did not consider asking for relief from the State of Connecticut. Pratt did not seek the Union's input on ways to decrease costs or increase productivity as an alternative to the proposed restructuring. Pratt did not take any of these steps, despite the fact that Pratt had been successful in seeking relief from the State, reductions in costs from the Union, and increases in productivity from the Union in 1993 and, again in 1998, in seeking relief from the Union. At an Executive Steering Committee meeting after the restructuring plan was announced, Pratt indicated to the Union that it would not reconsider its decision.[7]

Pratt's failure to make any effort to preserve the work has significant negative consequences for the Union. The loss of 507 parts repair jobs from the bargaining unit will substantially diminish the Union's leverage in negotiating its next contract. As Pratt's co-spokesman in contract negotiations testified, a company has to calculate, in labor negotiations with a union, where each party has or lacks leverage. In calculating the respective strengths and weaknesses, Pratt determines how far it thinks it can go without triggering a strike. Once jobs are moved out of a bargaining unit, they are of no concern to Pratt in negotiations. A stoppage of work by the workers in those positions is no longer a risk faced in the contract negotiations.

By December 2001, under the restructuring plan, all of the parts repair manufacturing work will have been moved outside of Connecticut, and there will be no bargaining unit employees performing that work. The physical plants will have been permanently altered, the machinery moved or sold, the workers who performed those functions will have been laid off or, if they are personally fortunate, reassigned to different jobs, Pratt will have hired workers in the locations to which the work has been moved, and invested in capital improvements and machinery in those plants. It will be impossible to discuss in any meaningful way the possibility of reestablishing the work: in fact, Pratt representatives testified that jobs moved out of the CBA would not be an appropriate subject for negotiations. The Union will have lost its ability to bargain effectively to try to keep the work, or even be able to negotiate, in exchange for its loss, some other meaningful benefit during the next collective bargaining process. In addition, the Union's role as bargaining unit representative will be subverted by its failure to receive the benefit of the terms it negotiated with Pratt. It is not readily apparent to the court how to monetarily quantify these harms.

---

7. After the announcement, Pratt agreed to extend its early retirement program to the parts repair workers affected by the transfer of jobs. Of the 507 people whose parts repair jobs ire being moved out of the bargaining unit, approximately 76 have subsequently accepted the voluntary early retirement program.

On the other side, one of Pratt's witnesses claimed that the restructuring was necessary for the "survival of the business." The court rejects that conclusion. The restructuring plan decided on by Pratt advances its interests as a whole by seeking to increase business volume and profits. However, it was decided upon without any consideration of maintaining parts repair work normally and presently performed by bargaining unit members. Had Pratt made "every effort" to maintain that work in Connecticut through December 1, 2001, Pratt would likely have achieved lower profits, and maybe suffered some loss through the end of the CBA, but the continued viability of its business cannot seriously be questioned on the record before this court. Based only on some rough estimates, the loss suffered due to having bid on long-term contracts based on assumed savings from restructuring would be much less than profits (based on last year) from existing business in the same period.[8] As sketchy as the profit and loss evidence is, what is clear is that there is no record to support an argument that Pratt's "survival" is even remotely in jeopardy if the restructuring plan is delayed, at most, until the end of the CBA.

### CONCLUSIONS OF LAW

*Jurisdiction.* Section 301 of the Labor Management Relations Act confers on district courts jurisdiction to enforce collective bargaining agreements. 29 U.S.C. § 185(a); *Niagara Hooker Employees Union v. Occidental Chem. Corp.*, 935 F.2d 1370, 1375 (2d Cir.1991). In its Ruling of January 6, 2000, this court held that the

Norris–LaGuardia Act, 29 U.S.C. § 101, *et seq.*, did not prohibit granting injunctive relief under the facts of this case if injunctive relief is warranted. *See* Ruling on Motion to Dismiss ("Ruling") at 20. Nothing presented at trial alters the court's prior Ruling in this regard.

■ Pratt contends that the CBA deprives this court of subject matter jurisdiction to resolve the disputes at issue. In particular, Pratt argues that Article 27's provision that "[t]he final decision regarding closing a plant or transferring a business unit rests solely with the Company" expresses clear intent by the parties to preclude any third-party review. Pratt's argument is inapposite, however, because the Union does not contest Pratt's right to make the final decision with respect to closing a plant or transferring a business unit. Instead, the Union contends that Pratt violated Letter 22 because Pratt failed to make "every effort" to preserve certain work pursuant to Letter 22. The Union also alleges that Pratt's plans to reduce the number of bargaining unit members employed at the North Haven facility violates an implied covenant of good faith and fair dealing arising from Letter 22. The Union does not argue that Pratt lacks the right to make a "final decision" pursuant to Article 27, so long as in doing so, it has acted in a manner consistent with Letter 22.[9] Thus, whether Pratt has violated Letter 22 or an implied covenant arising therefrom is a matter that is properly before this court.

Letter 22 expressly provides that matters covered by Letter 22 are nor subject

---

**8.** The record is very sketchy on this issue. In response to the court's question, Mr. Weiner testified that the value of the newly won long-term (10–year) contracts total $800 million in 1999 and are expected to total $1.2 billion this year. Estimating that to date, approximately $1.0 billion in such contracts have been signed, the total value of work done and to be done on these through the end of the CBA would be approximately $220 million. Given a 5% profit when bid, which assumed 30% lower costs than could now be obtained if the restructuring plan does not go forward,

the loss to Pratt might approximately be half its profit for 1999.

**9.** The parties' contractual history supports this reading. In the 1993 Joint Agreement, the relevant language read: "the Company agrees, as a limitation on its contractual rights set forth in Article 1 and elsewhere in the [CBA], ... it will take no action ..." When "take no action" became "make every effort," the reference to a "limitation" on management rights was eliminated.

to binding arbitration. It provides only that disputes concerning workplace guarantees and subcontracting are to be "referred to and discussed by the Executive Steering Committee" at its next regularly scheduled meeting. It neither clearly nor explicitly establishes a final and binding method for Letter 22 disputes such that the Union would be precluded from seeking relief from the court. *See* Ruling at 24–28; *see also Groves v. Ring Screw Works*, 498 U.S. 168, 175–76, 111 S.Ct. 498, 112 L.Ed.2d 508 (1990).

***Implied Covenant of Good Faith and Fair Dealing.*** The terms of Letter 22 are clear and unambiguous. By its terms, Letter 22 requires Pratt to continue to employ bargaining unit members in its facilities in East Haven, Middletown, North Haven and Cheshire for the life of the CBA. It does not require Pratt to employ any specific number of bargaining unit employees at those facilities for the life of the CBA. Thus, to the extent the Union advances a claim that Pratt's decision to close the North Haven plant after the expiration of the CBA as part of its proposed restructuring breaches Letter 22's express agreement to employ bargaining unit members at North Haven, the court rejects such an argument.

■ The court has found that the best estimate of how many bargaining unit employees will be working in North Haven at the expiration of the current CBA is 100 employees.[10] Because Letter 22 does not mandate that a specific number of employees must be employed, and because the Union has not proven that no bargaining unit employees will still be working at North Haven on December 2, 2001, the court concludes that Pratt has not breached its workplace guarantee regarding the North Haven plant.[11]

■ The Union argues further, however, that even if Pratt's plans do not violate the letter of the parties' agreement they violate the contract's implied covenant of good faith and fair dealing. The Second Restatement of Contracts recognizes an implied covenant of good faith and fair dealing in every contract without limitation. *See* 2 Restatement (2d) of Contracts § 205 (1979); *see also Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) (bad faith claim rooted in contract could be brought under section 301). "[G]ood faith performance of a contract 'emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party'" while bad faith may be seen in "evasion of the spirit of the bargain, lack of diligence and slacking off, rendering of imperfect performance, abuse of power to specify terms, and interference with or failure to cooperate in the other party's performance." *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir.1991), quoting 2 Restatement (2d) of Contracts § 205 cmts. a, d.

---

**10.** The Union does not dispute that 100 bargaining unit employees will likely be working at the North Haven plant at the time when the CBA's expires. *See* Pl.'s Post–Trial Mem. at 39 n. 55.

**11.** Pratt also urges upon the court an argument that this claim is nonjusticiable, that is, that the claim is not ripe and that the Union lacks standing due to a lack of injury-in-fact. The court disagrees. The ripeness requirement exists to "prevent the courts, though premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409. This does not mean that a plaintiff need "await the consummation of threatened injury to obtain preventative relief;" rather, a "claim is ripe if the perceived threat due to the putatively illegal conduct of the [defendant] is sufficiently real and immediate to constitute an existing controversy." *Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir. 1994) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1000, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)).

Because there is nothing abstract about Pratt's restructuring plans, in which it has invested effort and which it has already begun to implement, the court finds that the Union faces a sufficiently real and immediate threat to make this action justiciable.

■ The Union first contends that Pratt violated the implied covenant of the parties' agreement by making a final decision two years prior to the CBA's expiration to stop performing bargaining unit work at North Haven. According to the Union, such conduct evades the spirit of the agreement. The court disagrees. The CBA is in effect through December 2, 2001, and the evidence at trial showed that bargaining unit employees will be working at the North Haven plant at that time. The Union cannot infer a "spirit" to continue the CBA beyond its expiration when the parties expressly agreed that the CBA is in effect from October 8, 1998 through December 2, 2001.[12] The Union could have extracted a promise by Pratt to, e.g., "take no steps" toward closing a facility but did not. Nor can the Union claim "justified expectations" of Pratt maintaining a minimum population requirement, given that the Union sought unsuccessfully to achieve provisions requiring specific numeric minimum employment levels in 1993 and 1995.[13] Indeed, in a newsletter circulated during the 1993 negotiations, the Union denounced the workplace guarantees provision for not protecting a minimum number of jobs.

Secondly, the Union argues that Pratt never indicated during the 1998 negotiations that there was a risk of closing the North Haven plant. Instead, Pratt reassured the Union that 1998 was not a repeat of the crisis of 1993 and stated that work would be gravitating to Connecticut. The Union claims that Pratt knew the fate of the North Haven plant was uncertain during negotiations, and that Pratt's failure to inform them of this violated the spirit of the CBA as well as the justified expectations of the Union and the bargaining unit employees working at North Haven.

However, the Union concedes it has "no evidence that the specific decision to close North Haven was discussed [within Pratt] prior to the end of contract negotiations." Pl.'s Post–Trial Mem. at 41 n. 56. It has also shown no evidence linking Pratt's comments, about work "gravitating to Connecticut," to the continued operation of the North Haven facility following the expiration of the CBA. Although the decision to restructure followed quickly upon the heels of the 1998 negotiations, arguably giving rise to a question of bad faith, the court concludes that the Union has not met its burden of proof on this claim. Therefore, judgment will enter for Pratt on the claim of breach of implied covenant of good faith and fair dealing with regard to the transfer of some jobs from, and the planned, post-contract closing of, the North Haven plant.

***Every Effort.*** The Union contends that Pratt has violated Letter 22 by failing to make "every effort" to keep the parts repair work conducted at the North Haven and East Hartford facilities in Connecticut. Pratt responds 1) that it had no such obligation; 2) that the bargaining history between the parties supports Pratt's interpretation of Letter 22; 3) that the language of the "every effort" provision is too vague to be enforceable, and 4) that the Union has failed to show that Pratt did not "make every effort" pursuant to Letter 22. Upon hearing the evidence at trial, the court agrees with the Union that Pratt did breach its promise to "make every effort" as required by the CBA.

■■ In interpreting a collective bargaining agreement, traditional rules of

---

**12.** To the extent that the Union maintains a claim that the plant's closing some time after the CBA expires constitutes a breach of the implied covenant of good faith and fair dealing, the court notes that section 301 of the Labor Management Relations Act does not confer jurisdiction for "a claim based on events occurring after the expiration of a collective bargaining agreement." *Derrico v.*

*Sheehan Emergency Hospital,* 844 F.2d 22, 25 (2d Cir.1988).

**13.** Nor does the record support a finding that the 100 workers are a sham: they will be doing work and operating machines that have been at the North Haven plant historically.

contractual interpretation apply as long as they are consistent with federal labor policies. *D.E.W., Inc. v. Local 93, Laborers' Int'l Union of North America,* 957 F.2d 196, 199 (5th Cir.1992); *Plumbers and Steamfitters Local No. 150 Pension Fund v. Vertex Constr. Co.,* 932 F.2d 1443, 1448 (11th Cir.1991); *Local 205, Community and Social Agency Employees' Union v. Day Care Council of New York, Inc.,* 992 F.Supp. 388, 391–92 (S.D.N.Y.1998). The Restatement of Contracts provides that "specific terms and exact terms are given greater weight than general language." Restatement (2d) of Contracts § 203(c) (1979). The Restatement also provides "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." *Id.* at § 203(a). *See also Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); *Interstate Brands Corp. v. Bakery Drivers & Bakery Goods Vending Machines, Local Union No. 550,* 167 F.3d 764 (2d Cir.1999); *EDO Corp. v. Newark Ins. Co.,* 878 F.Supp. 366, 372 (1995). Where a contract is unambiguous, "courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *United States Trust Co. v. Jenner,* 168 F.3d 630, 632 (2d Cir. 1999) (citations and internal quotations omitted).

■ The terms of Letter 22 are clear and unambiguous. They state, in relevant part:

Pratt will make every effort to preserve the work that is presently and normally manufactured by employees covered by Article 2 of this Agreement. Therefore, it is not the intent of the Pratt to use subcontractors for the purpose of reducing or transferring work that is presently and normally manufactured by employees in the bargaining unit nor to place such work in Maine or Georgia, except when . . .

Pratt argues first that applying the rules of contract interpretation to the clear unambiguous language of the CBA permits Pratt's proposed transfer of 507 jobs out of North Haven and East Hartford. Pratt points to Article 1, which gives Pratt management the "sole right and responsibility to direct the operations of the Company and in this connection to determine the number and location of its plants; . . . [and] the assignment of all work to employees or other persons . . . unless otherwise herein provided." Pratt argues that this language, in addition to the statement in Article 27 that Pratt has the final decision on plant closings and business unit transfers, gives Pratt full authority to continue with its restructuring plans. Related to this argument is Pratt's position that, if Letter 22 limits management's exercise of Article 1 powers, it does so only to the extent that it provides Pratt does not intend to subcontract work or transfer it to Maine or Georgia. In other words, Pratt urges the court to read the first sentence of the above-quoted language about making "every effort" as merely a general proposition for which the more specific sentence that follows controls and limits the meaning.

The court rejects these arguments. First, it has concluded that Letter 22 does limit management rights under Article 1, although not necessarily under Article 27. If the Union had challenged the final decision to close a plant or transfer a business unit, the court would find in favor of Pratt. The Union, however, has challenged Pratt's failure to make "every effort" in reaching such a decision.[14] This challenge invades the management prerogative of Article 1, but only insofar as Article 1 allows through its express provision "unless otherwise herein provided," *i.e.,* as provided for in Letter 22.

14. If, after having made every effort to preserve the work, Pratt must close a plant or transfer a business unit, it has the power to do so under Article 27.

Second, the court concludes that Pratt's Letter 22 obligations have meaning beyond subcontracting or placing work in Maine or Georgia. Pratt argues that the word "therefore" must be accorded its generally prevailing meaning, which Webster's defines "as a result of," or "consequently," "for that reason" or "hence." *Webster's II New College Dictionary,* at 1145 (1995). The court does not disagree. It does not, however, agree that according "therefore" its prevailing meaning requires that the "every efforts" sentence be made into a general proposition for which the more specific, following sentence provides all meaning. Instead, the court reads the "make every effort" sentence as having a meaning of its own, while the following sentence provides some specific examples of what Pratt will not do or does not intend to do in fulfillment of its obligations set forth in the first sentence. Pratt's expression of intent against subcontracting certain work or not placing such work in Maine or Georgia is illustrative, or a consequence of, the promise in the sentence that precedes it, not definitive of its limitations.[15]

Pratt urges that reading Letter 22 as it suggests conforms with the principles of contract interpretation and gives meaning to both the "every efforts" sentence and the one that follows. Pratt cites the Restatement (2d) of Contracts, which provides "if the specific or exact can be read as an exception or qualification of the general, both are given some effect." *See* Def.'s Post–Trial Br. at 25–26. Pratt further argues that reading the "every efforts" sentence as an independent promise renders the provisions that follow it superfluous, and that such a result would be contrary to the principles of contract interpretation. *See* Restatement (2d) of Contracts § 203 cmt. b (1979).

The court agrees with Pratt that the court should seek, in its reading of the CBA, not to render any part superfluous. However, reading the "every effort" sentence as an independent promise does not make the provisions following it superfluous. The provisions that follow, which state that it is not Pratt's intent to subcontract or place certain work in Maine or Georgia, provide specific, concrete examples of what Pratt will not do as a result of its promise, *i.e.,* in order to meet its obligations. The court does not read them, however, as removing all other meaning from the first sentence. Interpreting the language in this way renders nothing in Letter 22 superfluous.

The same is not true of Pratt's suggested interpretation. According to Pratt, the *only* meaning that the "every efforts" sentence should have would derive from the more specific promises that follow it. However, adopting that interpretation would compromise the "every efforts" provision: it would be rendered entirely superfluous. That result is contrary to the rules of contract interpretation. *See United States v. International Brotherhood of Teamsters, et al.,* 970 F.2d 1132, 1136 (2d Cir.1992); Restatement (2d) of Contracts § 203(a) cmt. b. The court therefore concludes that the only way to give effect to all the provisions, render them consistent, and make no one provision superfluous is to read the "every efforts" statement as more than an empty promise and to read the "therefore" statement as providing examples of specific things Pratt will not do, or does not intend to do, in consequence of its "every efforts" promise.

Pratt's second argument is that the bargaining history between the parties supports its interpretation of Letter 22. Where a contract is unambiguous, however, "courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *United States Trust Co. v. Jenner,* 168 F.3d 630, 632 (2d Cir.

---

**15.** Had the parties intended the reading Pratt urges, they could have provided so. For example, they could have deleted the first sentence (as, in Pratt's view, extraneous), or used "in other words" in place of "therefore," or introduced the first sentence with "whereas."

1999) (citations and internal quotations omitted). Pratt concedes that the terms of Letter 22 are clear and unambiguous. Def.'s Pretrial Mem. at 6. Therefore, the bargaining history between the two parties is irrelevant.

■ Pratt's third contention is that, even if the "make every effort" provision has independent meaning, the provision is unenforceable. In support of its argument, Pratt cites several cases about how "every effort" is too vague and indefinite to constitute an enforceable promise as a matter of law. *See, e.g., Aqua–Chem, Inc. v. National Labor Relations Bd.,* 910 F.2d 1487, 1490–91 and n. 5 (7th Cir.1990) (agreeing with NLRB that letter mailed to laid-off employees indicating that plaintiff would make "every effort" to return them to work was too vague to override clear expression to them that they would not be returned to work); *Brinkley v. Honeywell, Inc.,* 35 F.3d 570, 1994 WL 467996, at *3 (9th Cir. Aug.30, 1994) (company handbook's statement that it will "make every effort in terms of counseling employees whose work is unsatisfactory" did not constitute a binding promise to an at-will employee); *Nellis v. ALPA,* 815 F.Supp. 1522, 1527, 1540 n. 15 (E.D.Va.), *aff'd* 15 F.3d 50 (4th Cir.1994) (company president's promise to striking pilots that the company was going to make every effort to see that pilots transferred with seniority "too vague" to represent a commitment the breach of which would constitute a violation of the duty of fair representation); *Allen v. MCI Tel.,* 707 F.Supp. 309, 309–10, 313 (N.D.Ohio 1988) (representation on orientation videotape that company would make "every effort to provide for stability of employment" was too indefinite to qualify as an offer of contract to an at-will employee). These cases are inapposite, however, because none involves an obligation to use every effort which is contained in a document that is admittedly a contract.

Courts that have addressed "every effort" in the context of a contractual language have certainly found it enforceable. *See, e.g., Westinghouse Hanford Co. v. Hanford Atomic Metal Trades Council,* 940 F.2d 513, 518, 522–24 (9th Cir.1991) (remanding labor dispute to district court for order compelling arbitration on question of whether plaintiff violated CBA obligation to "make every effort . . . to provide regular employment for its bargaining unit employees before work is contracted outside"); *Local 461 and District III of the Int'l Union of Electrical Radio and Machine Workers, AFL—CIO v. Singer Co.,* 540 F.Supp. 442, 443–45, 448–49 (D.N.J. 1982) (defendant breached its agreement to use "every effort" to secure defense contract work and improve productivity of plant). Because the court has found that Pratt has a contract and part of its contractual obligations include making every effort to preserve the work normally and presently performed by workers covered by the CBA, the court concludes that such an obligation is not too vague to be enforced.

The court notes, moreover, that the language of Letter 22 is clear. Pursuant to the Restatement, terms are to be given their generally prevailing meaning. *See* Restatement (2d) of Contracts § 202(3) (1979). "Every" means "[c]onstituting each and all members of a class with no exception." *Webster's II New College Dictionary,* at 389 (1995). "Effort" is an "[e]xertion of physical or mental energy to do something," an "earnest attempt." *Id.* at 360. Thus, making every effort requires making any and all earnest attempts that are reasonably possible to preserve the work that is normally and presently manufactured by Article 2 employees at the locations listed.

Lastly, Pratt argues that the Union has failed to prove Pratt did not make "every effort" to preserve the work as required by Letter 22. Pratt claims that it considered all the options but, upon determining that the costs of keeping the parts repair work in Connecticut were too high, it made the best decision it could for the business

as a whole. Pratt further contends that this action, plus the results of the "meet and confer" sessions, constitutes "every effort" pursuant to Letter 22, and that the Union has failed to prove otherwise.

The court disagrees. Evidence at trial showed that Pratt made, in fact, no effort to preserve the parts repair work presently and normally manufactured by bargaining unit employees covered by Article 2. Pratt made no distinction between employees within the bargaining unit and employees outside the bargaining unit. In fact, Pratt management admitted on the stand that it had made no "practical effort" to adhere to its Letter 22 obligations.

Instead, in deciding on its restructuring plan, Pratt acted as if the "make every effort" provision was a nullity, which is not surprising given its position on the meaning of Letter 22 in court. Pratt's object was profit maximization, with no effort made to preserve the work in question. Its decision was driven by the desire solely to lower costs, in order to be more competitive and gain more business, all of which is rational and reasonable from a business perspective, absent Pratt's contractual obligations to the Union. There is no evidence that it made every reasonable effort to preserve the work.

As for Pratt's efforts as a result of the "meet and confer" sessions, the court concludes that they are responsible actions, but not relevant to Pratt's Letter 22 obligations. Providing voluntary early retirement programs to approximately 76 bargaining unit members, or providing certain seniority rights, relocation expenses, and identification of jobs that bargaining unit members could seek, are not efforts to "preserve the work." Moving other work from Florida to Connecticut is not an effort to preserve the "work presently and normally" done by employees covered by the CBA.

Thus, the court finds that the Union has met its burden of proof as it relates to

Pratt's failure under Letter 22 to satisfy its obligation to "make every effort" to "preserve the work" when Pratt decided upon its restructuring plan which does not preserve that work.

***Specific Performance.*** The remaining issue in this case requires a determination of whether injunctive relief to enforce specific performance is appropriate and warranted. The Union seeks an injunction ordering Pratt to comply with its Letter 22 obligations. Since the court has decided that the Union failed to carry its burden on its claim of violation of the implied covenant of good faith and fair dealing, it will not enter injunctive relief specifically in regards to the North Haven facility. However, the court must consider whether injunctive relief is appropriate on the Union's claim that Pratt failed to make every effort to preserve the work normally and presently manufactured by Article 2 employees.

Pratt makes several arguments against granting such relief. First, it claims that this court lacks jurisdiction to enter an injunction in this labor dispute under the Norris–LaGuardia Act, 29 U.S.C. §§ 101, *et seq.*, and under Supreme Court and Second Circuit precedent. The court addressed this issue in its Ruling on Pratt's Motion to Dismiss and found that it had jurisdiction to do so in this case. *See* Ruling at 20. The court adheres to its earlier Ruling.

Second, Pratt contends that the Union has failed to satisfy the procedural requirements of the Norris–LaGuardia Act as laid out in Pratt's Pretrial Memorandum. This court notes that it has already held that the Union need not satisfy those procedural requirements that are inapposite to its claim. *See* Ruling at 21–22. The Court held that the Union must satisfy the usual requirements for the issuance of an injunction as laid out in *Guinness–Harp Corp. v. Jos. Schlitz Brewing Co.,* 613 F.2d 468 (2d Cir.1980).[16] The Second

---

**16.** Pratt argues that decisions in the Second

Circuit subsequent to *Guinness–Harp* require

Circuit held in *Guinness–Harp* that, in the context of seeking specific performance of a contract, the "[r]ecognition of the 'final' nature of the injunction avoids the need of inquiring whether the traditional test for a preliminary injunction has been met." *Id.* at 471. Since the injunction sought by the Union is, in fact, final, it must "demonstrate that its legal position is correct." *Id.* Because it is "not really preliminary to any further court determination," however, the "irreparable injury requirement of a preliminary injunction need not be met as such." *Id.* Instead, "the Union must satisfy the traditional equitable standards for specific performance of a contract," *id.*, as well as any applicable requirements that section 7 of the NLA may require in this context.[17]

■ The test for specific performance of a contract is somewhat flexible. *See Nemer Jeep–Eagle, Inc. v. Jeep–Eagle Sales Corp.*, 992 F.2d 430, 433 (2d Cir. 1993).

It initially requires proof that (1) a valid contract exists between the parties, (2) the plaintiff has substantially performed its part of the contract, and (3) plaintiff and defendant are each able to continue performing parts of the agreement. A party seeking relief must show equitable factors in its favor, for example, the lack of an adequate remedy at law, and must also demonstrate that its risk of injury, if the injunction is denied, is one that after balancing the equities entitles it to relief. One of the factors balanced is irreparable harm.

*Id.* (internal citations omitted). Before specific performance may be ordered, the court must determine whether remedies at law are incomplete and inadequate to accomplish substantial justice. *See Leasco Corp. v. Taussig*, 473 F.2d 777, 786 (2d Cir.1972).

There is no dispute that Pratt and the Union are parties to a valid CBA and that the Union has substantially performed its part of the agreement to date and is able

that plaintiffs must show irreparable harm to obtain permanent injunctive relief. In support of its contention, Pratt cites *Rodriguez v. DeBuono*, 175 F.3d 227, 235 n. 9 (2d Cir. 1999); *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir.1989); *Ladd v. Thomas*, 14 F .Supp.2d 222, 224 (D.Conn.1998). None of these cases, however, deal with an injunction in the context of specific performance of a contract. *Rodriguez* involved a challenge to the operation of New York's task-based assessment programs under the Medicaid statute. *See* 175 F.3d at 230–31. *Terry* involved an injunction to stop anti-abortion forces from blocking ingress and egress to a clinic. *See* 886 F.2d at 1343. *Ladd* involved an injunction to enforce a declarative judgment detailing that certain actions taken by the Connecticut Department of Social Services in carrying out its duties under the Medicaid statute violated federal law. *See* 14 F.Supp.2d at 223–24. These cases are inapposite to the case at bar.

Pratt also cites *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir.1999) for the proposition that a showing of irreparable harm is required for any injunctive relief. *Ticor* involves the enforcement of a covenant not to compete. *See id.* at 66. While this scenario is somewhat similar to the case at bar, the Second Circuit in *Ticor* did not analyze the

covenant in the context of specific performance of a contract. Therefore, this court concludes that the more compelling precedent is provided by *Guinness–Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468 (2d Cir.1980), and *Nemer Jeep–Eagle, Inc. v. Jeep–Eagle Sales Corp.*, 992 F.2d 430 (2d Cir.1993), both of which analyze the propriety of an equitable injunctive remedy in the context of specific performance of a contract.

17. Section 7 of the Norris–LaGuardia Act requires that certain procedural requirements be met before a court may issue an injunction in a labor dispute. *See* 29 U.S.C. § 107. Although the court is not persuaded that such requirements are necessary in the context of ordering specific performance by the employer of a collective bargaining agreement, the court notes that the requirements of section 7 that are not inapposite to the Union's claim have been met. Specifically, the court has conducted a public hearing with notice pursuant to 29 U.S.C. § 107(e), and has made findings of fact that there is irreparable injury, *id.* at § 107(b); that the equities favor the Union, *id.* at § 107(c); and that the Union has no adequate remedy at law, *id.* at § 107(d). The court need not find that "unlawful acts have been threatened" pursuant to 29 U.S.C. § 107(a). *See* Ruling at 20–21.

to continue to perform. Although Pratt introduced some evidence of lost business and profits under the current CBA, the court is unpersuaded that Pratt is unable to continue performing its part as described in the CBA. Therefore, it is appropriate to look to the balance of equities between the parties.

The court concludes that the Union has no adequate remedy at law and will therefore suffer irreparable harm should the court fail to enjoin Pratt from proceeding with its plans. The leverage that the Union would have at the bargaining table vis-a-vis the parts repair manufacturing work will be substantially diminished if Pratt is not enjoined from proceeding with its current plans.[18] Such a loss has been treated by courts as a cognizable harm. *See, e.g., International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Mack Trucks Inc.*, 820 F.2d 91, 95–96 (3d Cir. 1987) (error for district court to treat as "harmless" management's unilateral change in health plan contrary to collective bargaining agreement: depriving Union of a valuable bargaining chip was "sort of harm ... compensable only by a permanent injunction"); *International Ass'n of Machinists & Aerospace Workers (IAM) v. Northwest Airlines Inc.*, 674 F.Supp. 1387, 1391–92 (D.Minn.1987) (potential harm of allowing company to unilaterally change collective bargaining agreement was "grave:" it undermined IAM's statute as sole representative and proponent of the employees' interests).

Furthermore, injunctive relief is appropriate where, as here, monetary damages would be extremely difficult, if not impossible, to ascertain. *See Danielson v. Local 275, Laborers Int'l Union of North America, AFL—CIO*, 479 F.2d 1033, 1037 (2d Cir.1973) ("Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate."); *see also Nemer*, 992 F.2d at 436 ("Doubts concerning the adequacy of money damages should be resolved in favor of specific performance."), citing Restatement (2d) of Contracts, § 359, cmt. a (1981). This court is not capable of putting a price on the loss of leverage the Union would suffer without engaging in speculation.[19] Pratt argues that an injunction ordering specific performance of the CBA may prove difficult to manage. The court could, however, upon a factual record, determine whether Pratt has made all earnest attempts toward preserving the work. There is, however, no such basis for determining the damages to the Union.

Pratt contends that the balance of hardships dips decidedly in its favor. As opposed to the harm that will result to the bargaining process if an injunction does not issue, Pratt claims that an injunction preventing it from proceeding with its restructuring plans will result in a loss of "approximately $600,000,000 in savings over the life of the current CBA."[20] Def.'s Post–Trial Br. at 69. The Union counters that Pratt's potential losses result from its own decision to change the bidding structure before the legal issues were resolved, and, as such, Pratt should not now benefit

18. The court recognizes that all Pratt must do is use "every effort" to maintain the jobs in question and that, even if Pratt performs that contractual obligation, the jobs in question may be still be moved before the expiration of the contract. However, that is all the parties contracted for.

19. How much less of an hourly wage increase will the Union be able to achieve because the ultimate threat of strike of a lucrative and growing part of Pratt's work is not present? Or how does one quantify, for the Union, the value of lost confidence in it by its remaining members because the Union did not obtain the benefit of its bargain?

20. Further, the court does not find that the record supports the claimed loss in savings cited by Pratt. The evidence was very sketchy, but it is likely the loss for contracts entered into from August 1999 to February 2000 and as performed to the end of the CBA (December 2001) is much less than a quarter of $600 million.

from a dilemma of its own making.[21] *See, e.g., W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 766–67, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); *Nemer Jeep–Eagle, Inc. v. Jeep–Eagle Sales Corp.,* 992 F.2d 430, 436 (2d Cir.1993). The court finds that the Union has the more persuasive argument. Pratt was not forced by economic exigency to change the bidding structure. In fact, the Engine Services parts repair work was making a significant profit before the bidding structure was altered based on the restructuring plan. Instead, Pratt sought to reap even more profits by breaching its agreement with the Union. The balance of equities, therefore, tips in favor of the Union, not Pratt.

Pratt makes several arguments against compelling specific performance of the collective bargaining agreement. First, it contends that there is no irreparable harm because employees laid off can be reinstated with back pay, if the court sees fit. Pratt cites to numerous cases where courts found that loss of employment did not constitute irreparable harm since employees could, upon resolution by an arbitrator, reinstate employees and pay damages, if necessary. *See, e.g., Niagara Hooker Employees Union v. Occidental Chem. Corp.,* 935 F.2d 1370, 1379 (2d Cir. 1991); *Aluminum Workers Int'l Union, Local Union No. 215 v. Consolidated Aluminum Corp.,* 696 F.2d 437, 443 (6th Cir. 1982). While Pratt is correct that such temporary loss of employment pending final arbitration of a dispute may not constitute irreparable harm, the court finds this reasoning inapposite to the case at bar. This case involves neither a temporary loss nor a future arbitration. Instead, the court is providing final resolution to the merits of this case, and it is doing so now, not at some future date. Therefore, these cases cited by Pratt are unavailing.

Second, Pratt argues that the results of the "meet and confer" sessions held pursu-

ant to Article 1 prove that the injuries suffered by the Union are not irreparable. As the court noted above, Pratt's efforts resulting from "meet and confer" are responsible but irrelevant to Pratt's Letter 22 obligations. Offering voluntary early retirement programs, providing certain seniority rights, relocation expenses, and identification of jobs that bargaining unit members could seek address the losses suffered by those workers currently performing the work that is the subject of Letter 22. Such efforts do not, however, address the harm faced by the Union in losing 507 parts repair manufacturing jobs from its bargaining unit.

Third, Pratt contends that harm from a reduction in leverage is necessarily speculative and that Union can still take a strong position in bargaining for its next contract despite the jobs that will be lost. The evidence at trial, however, showed the opposite. Although one company representative stated that he thought the Union might be in a stronger position to negotiate about the parts repair work if Union members were angered by the loss of the jobs and concerned theirs might be next, others conceded, and the court finds, that the Union will be weaker generally through loss of leverage. Further, Pratt will not have to consider at all the Union's opinions on work that is no longer physically based in the bargaining unit. *See supra* at 125–26.

Fourth, Pratt argues that the court should not involve itself in attempts to balance relative bargaining power as a matter of federal labor policy. Pratt cites numerous cases to support its contention that the parties should be unrestricted by anything but the "free play of economic forces" during CBA negotiations. *See, e.g., Lodge 76, International Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d

**21.** The Union also, based on the record, correctly challenges Pratt's calculation of losses at $600 million.

396 (1976) (citation omitted). The court agrees. However, this case is not about balancing relative bargaining power. This case is about enforcing a collective bargaining agreement that the parties negotiated and agreed to themselves. In light of the jurisdiction conferred upon a district court by section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), so that it may enforce collective bargaining agreements, this court's decision is not a usurpation but rather in furtherance of federal labor policy. Pratt's argument on this ground is therefore rejected.

■ Finally, Pratt contends that the proposed injunction is too vague and overbroad to be enforceable. Specifically, it claims that it cannot know when it has satisfied the order to "make every effort" to preserve the bargaining unit work. Injunctive relief 1) should be "narrowly tailored to fit specific legal violations," and 2) should not impose unnecessary burdens on lawful activity. *See Waldman Publishing Corp. v. Landoll, Inc.,* 43 F.3d 775, 785 (2d Cir.1994). Rule 65(d) of the Federal Rules of Civil Procedure provides, in part, that an injunction "shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed.R.Civ.P. 65(d). "The normal standard of specificity is that the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden." *Sanders v. Air Line Pilots Ass'n, Int'l,* 473 F.2d 244, 247 (2d Cir.1972). As the Second Circuit has noted, the "reason for this requirement is that vague or general injunctions cannot be easily obeyed or effectively and fairly enforced. Rule 65(d) reflects Congress' concern with the dangers inherent in the threat of a contempt citation for violation of an order so vague that an enjoined

party may unwittingly and unintentionally transcend its bounds." *Perfect Fit Indust., Inc. v. Acme Quilting Co.,* 646 F.2d 800, 809 (2d Cir.1981) (citations omitted). Here, where the court has determined that the language of the Letter 22 is not too vague to be enforced, an injunction compelling specific performance of Letter 22 is neither too vague nor overbroad.[22]

## Conclusion and Order

Based upon the foregoing, judgment will enter for Pratt on the Union's claim concerning the "closing" of the North Haven facility. Judgment will enter for the Union on its claim that Pratt failed to abide by its contractual obligation to make "every effort" to preserve the work done by the plaintiff's bargaining unit members. Accordingly, Pratt & Whitney is hereby prohibited, during the life of the current CBA, from transferring parts repair work normally and presently performed by employees covered by Article 2 of the collective bargaining agreement to facilities outside the District 91 bargaining unit unless and until Pratt makes every reasonable effort to preserve that work within the District 91 bargaining unit.

## SO ORDERED.

---

**22.** Pratt raises the specter of the court running its business, or the Union challenging in court every little aspect of its decision process. The court has no intention of doing the former, and does not anticipate the latter. Should the court have to revisit the issue, the determination of whether efforts taken were all the ones reasonably available to Pratt will be, as in other cases before the court, a determination of fact based on the record developed, with the burden of proof on the Union.