**NIAGARA HOOKER EMPLOYEES UNION, Plaintiff–Appellee,**

v.

**OCCIDENTAL CHEMICAL CORPORATION, Defendant–Appellant.**

**No. 951, Docket 90–7868.**

United States Court of Appeals, Second Circuit.

Argued Jan. 17, 1991.

Decided June 20, 1991.

Thomas P. Gies, Crowell & Moring, Washington, D.C. (Victoria L. Eastus, of counsel), for appellant.

John A. Collins, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, Washington, D.C. (Eugene W. Salisbury, of counsel), for appellee.

Before OAKES, Chief Circuit Judge, and CARDAMONE and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Defendant-appellant Occidental Chemical Company ("Oxychem") appeals from an opinion and order of the United States District Court for the Northern District of New York, John T. Elfvin, *Judge,* preliminarily enjoining it from implementing random urinalysis drug testing of all "safety-sensitive" employees pending arbitration of the Union's grievance, which challenged the program as a violation of the collective bargaining contract. Because we find that the issuance of the preliminary injunction was not authorized by the narrow *Boys Markets/Buffalo Forge* exception to the Norris–LaGuardia Act, 29 U.S.C. § 101, *et seq.,* we vacate the preliminary injunction.

## BACKGROUND

The essential facts are not in dispute. Oxychem manufactures industrial chemicals at its facility in Niagara Falls, New York. Plaintiff-appellee Niagara Hooker Employees Union (the "Union") is the exclusive bargaining representative of the production and maintenance workers employed at the facility.

Oxychem and the Union entered into a collective bargaining agreement dated September 30, 1988 (the "CBA"), expiring on September 30, 1991. Under the terms of the CBA, parties are to submit disputes concerning working conditions and the application of the CBA's provisions to binding arbitration.

The CBA contains a "Drug and Alcohol Policy" prohibiting the use, possession, purchase, or sale of alcohol or illegal drugs by employees while on the job or on company property. The policy was the subject of lengthy negotiations between the Union and Oxychem. Among other things, it authorizes urinalysis drug testing of an employee if her supervisor reasonably suspects the use of illicit drugs (the "reasonable suspicion" program).

The CBA also contains a "management rights" clause. Article XIV grants Oxychem the discretion, absent restrictions by the CBA, to

make and enforce reasonable rules and regulations to promote safety, efficiency, discipline, order and protection of the Company's employees, operations, property and products from injury, damage or other loss from any source, including sabotage or other subversive activity.

Finally, the CBA contains what is known as a "zipper clause." Article XVIII provides:

This Agreement represents the full and complete understanding between the Company and the Union. Both parties hereby expressly waive their right to request further negotiations on any provisions contained in this Agreement or to request negotiations on any other subjects for the duration of this Agreement.

Despite the implementation of the "reasonable suspicion" program negotiated with the Union and described in the CBA in September, 1988, Oxychem experienced drug and alcohol-related incidents at the Niagara Falls facility: an employee who was monitoring chemical reactions fell asleep at his post; a truck driver failed to lower a truck bed, which then hit a railroad and chemical pipeline overpass above a public thoroughfare; and a chlorine worker was found injured, lying on a railroad track, unaware of his surroundings. Further, in response to reports of a "drug ring" within the facility in 1988 and 1989, the Niagara County District Attorney's Office, with Oxychem's cooperation, conducted an undercover operation at the facility that resulted in the arrest of eight Oxychem employees on drug-related charges.

In April 1990, as required by regulations issued by the United States Department of Transportation, Research and Special Program Administration ("DOT"), Oxychem

adopted a second drug-testing program. The DOT program requires that those "safety and security sensitive" employees who work with certain hazardous liquids and gases be subject to pre-employment, periodic, reasonable cause, post-accident, and random testing. 49 C.F.R. pt. 199. The Union has not protested Oxychem's implementation of the DOT program. The program covers slightly less than half of the more than 900 employees at the facility and chiefly includes only those employees engaged in the off-site transportation of hazardous gases or regulated hazardous liquids.

The DOT program, however, does not cover employees who work with many of the dangerous or toxic chemicals Oxychem produces, such as chlorine, caustic soda, and hydrogen fluoride. Accordingly, Oxychem decided to institute a third drug-testing program—the program at issue in this appeal—that would randomly test all safety-sensitive employees (the "random testing program"). The program would apply to employees holding "[a]ny job which may through mental or physical activity affect the safety and welfare of co-workers, the community and/or environment; includes policy-making positions." The program would use the same testing procedures and lab protocols as those used in the reasonable suspicion program instituted following negotiation with the Union and incorporation in the CBA.

On June 14, 1990, Oxychem informed the Union of its plan to implement the random drug testing program, and requested that the Union negotiate over the specifics of the plan. The Union refused. In a written reply, the Union president stated that the Union had no intention of negotiating a random drug testing program during the term of the current collective bargaining agreement, adding, "Any changes in [the drug and alcohol testing] policy should be addressed in the 1991 Contract negotiations."

Despite the Union's refusal to negotiate, Oxychem decided to implement the program effective August 3, 1990. On August 1, 1990, following the CBA's procedure, the Union filed a grievance stating that the unilateral implementation of the random drug testing program violated the CBA's "zipper clause" and drug testing provisions. Both parties agree that the grievance is subject to arbitration under the terms of the CBA.

On August 2, 1990, the Union filed the instant suit under Section 301(a) of the Labor Management Relations Act of 1947 ("LMRA"), alleging violations of the CBA. *See* 29 U.S.C. § 185(a). The complaint sought a preliminary injunction barring unilateral implementation of the random testing program pending arbitration of the grievance. The Union also moved for a temporary restraining order, which the district court denied upon Oxychem's representation that it did not plan to begin its random testing program for several weeks.

On August 13, 1990, the district court heard the motion for preliminary injunction. In support of its motion, the Union submitted an affidavit of Union Vice President Frank Marrone but offered no live testimony in support of its motion.

On August 17, 1990, the district court granted the preliminary injunction. It found that without an injunction the arbitral process would be frustrated, because "privacy rights and dignity of individuals, if violated by unlawful [drug] testing, could not be redressed by an arbitration decision favorable to the union." The district court also found that the Union had established irreparable harm by demonstrating that the random drug testing program violated the zipper clause, in which both parties promised that neither would request the other "to negotiate further any provision of the [CBA] or any other subject during the duration of the [CBA]." The district court reasoned:

> The presence of this express promise to retain the status quo distinguishes this [CBA] from others that do not have such a clause. It elevates a unilateral departure from the [CBA]'s terms, by either party, to a violation of the bargaining process itself and not merely a dispute over interpretation. Thus, regardless of whether the Union ultimately obtained a

favorable arbitration award, the integrity of the bargaining process itself, as well as the reputation of the Union as the representative of the employees, would be irreparably injured by testing under this program. (Footnotes omitted.)

The district court concluded that the equitable requirements for the injunction had also been satisfied, because the violation of privacy was irreparable, the Union had shown that its position was "sufficiently sound to prevent arbitration from being a futile endeavor," and the balance of hardships tipped in favor of the Union.

On August 31, 1990, Oxychem moved to dissolve the preliminary injunction. Oxychem contended that the Union's failure to present live testimony in support of the injunction violated the jurisdictional prerequisites of the Norris–LaGuardia Act, 29 U.S.C. § 101, *et seq.*, and that therefore the Union could not make a factual showing of irreparable harm. The district court denied the motion, holding that by failing to object, Oxychem had waived any argument as to the hearing procedures used by the district court. This appeal followed.

### DISCUSSION

Oxychem challenges the issuance of the preliminary injunction on three grounds. Oxychem argues: (1) the district court did not have authority to issue the injunction under the narrow *Boys Markets/Buffalo Forge* exception to the NLGA's proscription of injunctive relief; (2) because the district court proceedings failed to comply with the hearing requirements of the NLGA, the district court lacked jurisdiction to grant the injunction; and (3) the district court abused its discretion in issuing the preliminary injunction because the Union failed to satisfy the equitable requirements for the issuance of a preliminary injunction under *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979), and its progeny.

■ As a rule, we review the district court's grant or denial of a preliminary injunction under an abuse of discretion standard. *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704,

708 (2d Cir.1982). The term "abuse of discretion" describes a range of degrees of deference. We review decisions of law *de novo* and evaluate a district judge's findings of fact for clear error. In the context of the extraordinary nature of injunctive relief, we note further that " 'discretion is not boundless and must be exercised within the applicable rules of law or equity.' " *Savage v. Gorski*, 850 F.2d 64, 69 (2d Cir. 1988) (quoting *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193 (4th Cir.1977)). We must be careful to exercise "effective, and not merely perfunctory appellate review." *Roland Machinery Co. v. Dresser Ind., Inc.*, 749 F.2d 380, 389 (7th Cir.1984).

■ We turn first to Oxychem's contention that the district court erred in finding that the injunction was permitted under the exception to the NLGA created by *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), and its predecessor case, *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). Under the *Boys Markets/Buffalo Forge* exception, courts may grant the requests of employers to enjoin certain union activities pending arbitration of a dispute between the parties. We have not previously considered the application of the *Boys Markets/Buffalo Forge* exception to a union's request to enjoin an employer pending arbitration of a dispute between the parties.

In brief, Oxychem contends that an injunction against an employer may only be issued under *Boys Markets/Buffalo Forge* if the failure to issue the injunction would render the arbitral process a "hollow formality." Oxychem contends that the issuance of the injunction here was not only unnecessary to preserve the arbitral process, but detrimental to the process, because the district court usurped the function of the arbitrator by evaluating the merits of the underlying dispute between the parties.

The Union maintains that the district court properly issued the injunction under

the *Boys Markets/Buffalo Forge* exception, because, as the district court reasoned, a failure to enjoin the random testing program would "frustrate the arbitral process itself." In the alternative, the Union defends the injunction as an enforcement of Oxychem's promise, embodied in the zipper clause of the CBA, to maintain the status quo pending arbitration of the grievance.

The NLGA deprives federal courts of the jurisdiction to grant injunctive relief in labor disputes, except in limited circumstances. 29 U.S.C. § 101 provides in relevant part:

No court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter; nor shall any such ... order ... be issued contrary to the public policy declared in this chapter.

The NLGA was enacted to "correct the abuses that had resulted from the interjection of the federal judiciary into union-management disputes on behalf of management." *Boys Markets, Inc.*, 398 U.S. at 251, 90 S.Ct. at 1592; *see also Burlington Northern R.R. Co. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 437, 107 S.Ct. 1841, 1846, 95 L.Ed.2d 381 (1987). The broad language of the NLGA proscribes injunctive relief in labor disputes, whether on behalf of unions or employers. *See Pan American World Airways v. International Bhd. of Teamsters*, 894 F.2d 36, 40 (2d Cir.1990); *Hoh v. Pepsico*, 491 F.2d 556, 560 (2d Cir.1974) (finding NLGA applicable to request to enjoin employer); *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 458–59, 77 S.Ct. 912, 918–19, 1 L.Ed.2d 972 (1957) (ordering specific relief against employer). The Supreme Court has "consistently given the anti-injunction provisions of the [NLGA] a broad interpretation, recognizing exceptions only in limited situations where necessary to accommodate the Act to specific federal legislation or paramount congressional policy." *Jacksonville Bulk Terminals, Inc. v. International Longshore-*

*man's Ass'n*, 457 U.S. 702, 708, 102 S.Ct. 2672, 2678, 73 L.Ed.2d 327 (1982).

Subsequent to the passage of the NLGA, Congress enacted Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, *et seq.*, which was apparently designed to permit more liberal enforcement of collective bargaining contracts. Section 301, which creates a federal cause of action for breach of collective bargaining contract, provides in relevant part:

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). Section 301 promotes a " 'higher degree of responsibility upon the parties to such [collective bargaining] agreements.' " *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 561, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976) (quoting S.Rep. No. 105, 80th Cong., 1st Sess. 17 (1947)); *see also Groves v. Ring Screw Works,* — U.S. —, 111 S.Ct. 498, 502, 112 L.Ed.2d 508 (1990).

Section 301 is also the vehicle for enforcing the fundamental federal labor policy favoring recourse to private arbitration. *Textile Workers*, 353 U.S. at 455, 77 S.Ct. at 917 (1957) (Congress believed arbitration to be path to industrial peace). Under Section 301, federal courts are to fully effectuate a dispute resolution process designated in a collective bargaining contract. Disputes under a collective bargaining contract with an arbitration clause are presumed to be arbitrable. Courts are not to delve into the substantive provisions of such a collective bargaining contract, since this would usurp the function of the arbitrator. *Groves v. Ring Screw Works*, 111 S.Ct. at 502. After arbitration, courts are to enforce the decision of the arbitrator in all but the most limited of circumstances. *See United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593,

596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960); *United Steelworkers of Am. v. American Mfg. Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). These doctrines, like the federal pro-arbitration policy itself, are based partly on respect for the parties' choice of arbitration to resolve contract disputes and also partly on respect for the expertise of arbitrators concerning industrial relations. *Nolde Bros. v. Local No. 358, Bakery & Confectionary Workers Union*, 430 U.S. 243, 253, 97 S.Ct. 1067, 1073, 51 L.Ed.2d 300 (1977).

Section 301 thus both encourages arbitration and affords the party to a collective bargaining contract the benefit of its bargain. But in enacting the statute, Congress did not specify whether injunctive relief was available under it. This placed Section 301 in tension with the anti-injunction policy of the NLGA.

In *Boys Markets* and *Buffalo Forge*, the Supreme Court accommodated the twin policies of Section 301 by carving out a narrow exception to the NLGA. The exception permits employers to obtain injunctions against strikes pending arbitration of a dispute. In *Boys Markets*, the Court ruled that an employer could secure an injunction against a strike if the collective bargaining contract contained a no-strike clause, the strike was over an arbitrable issue, and the injunction was warranted under "ordinary principles of equity." 398 U.S. at 254, 90 S.Ct. at 1594.

The Court reasoned that the union's undertaking not to strike, whether express or implied, was the *quid pro quo* for the employer's promise to abide by binding arbitration. 398 U.S. at 247–48, 90 S.Ct. at 1590–91 (citing *Textile Workers*, 353 U.S. at 455, 77 S.Ct. at 917). Failing to enforce the promise, which the strike clearly violated, *see Buffalo Forge*, 428 U.S. at 406, 96 S.Ct. at 3147, would therefore eliminate "[a]ny incentive for employers to enter into such an arrangement [requiring arbitration]. . . ." 398 U.S. at 248, 90 S.Ct. at 1591. Further, enjoining the strike would prevent unions from using concerted activi-

ty to evade their obligations to arbitrate. 398 U.S. at 249, 90 S.Ct. at 1591.

In *Buffalo Forge*, the Court refined the *Boys Markets* exception in disallowing an injunction against a union's sympathy strike, notwithstanding the existence of a no-strike clause in the collective bargaining agreement. First, the Court determined that the no-strike clause did not clearly bar the sympathy strike. The legality of the strike itself was at issue, and the resolution of that dispute, since it required interpretation of the no-strike clause, was properly reserved for the arbitrator. The Court held that a judicial opinion interpreting and enforcing a no-strike clause would interfere with or influence a subsequent arbitral decision on the meaning of the clause. Further, enjoining the strike could very well permanently settle the issue of the strike's legality, again to the detriment of the arbitral process. 428 U.S. at 412, 96 S.Ct. at 3149.

Second, the underlying dispute, which involved the dispute of another union with *its* employer, was concededly not arbitrable. Because the strike in *Buffalo Forge* "was not over an arbitrable issue[, it] therefore did not directly frustrate the arbitration process," either by depriving the employer of its *quid pro quo* for agreeing to an arbitration clause, or by coercing the employer to settle the dispute despite a contractual right to subject the dispute to binding arbitration. *Jacksonville Bulk Terminals*, 457 U.S. at 722, 102 S.Ct. at 2685. Enjoining the strike was accordingly not necessary to preserve the arbitral process.

■ In order to enjoin a union strike under *Boys Markets/Buffalo Forge*, therefore, a court must find that the strike clearly violates an express or implied promise not to strike, and that the underlying issue is arbitrable. The Supreme Court has never applied this standard to a union's request to enjoin an employer action pending arbitration. Nonetheless, the analysis of *Boys Markets* and *Buffalo Forge* is surely relevant. When the Ninth Circuit enjoined an employer's action pending arbitration in *Amalgamated Transit Union*,

*Div. 1384 v. Greyhound Lines*, 529 F.2d 1073 (9th Cir.1976), the Supreme Court vacated that decision and remanded it to the Ninth Circuit for further consideration in light of *Buffalo Forge*, *see Greyhound Lines v. Amalgamated Transit Union, Div. 1384*, 429 U.S. 807, 97 S.Ct. 43, 50 L.Ed.2d 68 (1976), thereby indicating that the *Boys Markets/Buffalo Forge* exception to NLGA was intended to apply to injunctions against employers. *See also Local Union No. 733 v. Ingalls Shipbuilding*, 906 F.2d 149, 152 (5th Cir.1990); *Oil, Chemical and Atomic Workers, Local 2–286 v. Amoco Oil Company*, 885 F.2d 697, 702 (10th Cir.1989).

The exception developed in *Boys Markets* and *Buffalo Forge*, however, cannot simply be imported wholesale when a union seeks to enjoin an employer action pending arbitration. First, the "express promise" requirement would unduly burden a union attempting to enjoin an employer's action, even if that action were "clearly in breach of contract and ... failure to preserve the status quo [would] inflict[ ] grievous harm on union-worker interests." Cantor, *Buffalo Forge and Injunctions Against Employer Breaches of Collective Bargaining Agreements*, 1980 Wis.L.Rev. 247, 270 (1980). Employers use a wide variety of self-help methods, including both implementing their own interpretation of contractual language relating to, say, dress code, rules of conduct, or work shift assignments and disciplining employees who violate those rules. A union could not possibly anticipate every self-help method available to an employer and extract from the employer an "express promise" not to use it. Obtaining a general promise not to breach the contract in self-help would also not assist the union; courts could not find a "clear" violation of such a general "no self-help" clause without reaching the merits of the underlying dispute and thereby usurping the function of the arbitrator. *But cf. Boys Markets* (finding "clear violation" of no strike clause).

Implying a promise by an employer not to modify the status quo, on the other hand, might assist unions in obtaining injunctions. However, it would also unduly interfere with the prerogatives of management. Because labor disputes frequently arise out of common management actions involving, for example, discipline, workplace rules, and production targets, implying a promise to maintain the status quo would permit unions to embroil the judiciary in day-to-day disputes. Management initiatives would be stifled, economic costs on the employer would mount, and its ability to run the business would be impaired.

Further, it is unnecessary to imply an employer's duty to preserve the status quo from the existence of a promise to arbitrate. "[A] strike pending arbitration generally will frustrate and interfere with the arbitral process while the employer's altering the status quo generally will not." *Amalgamated Transit Union, Div. 1384 v. Greyhound Lines*, 550 F.2d 1237, 1238–39 (9th Cir.), *cert. denied*, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977).

Accordingly, in applying the *Boys Markets/Buffalo Forge* exception to a union request to enjoin an employer, it is more useful to focus directly on preserving the arbitral process, rather than on the promise of the employer, be it express or implied. We conclude that a union may obtain a *status quo* injunction against an employer when the employer's action has the effect of frustrating the arbitral process, or rendering it a "hollow formality." *Lever Bros. v. International Chem. Workers Union, Local 217*, 554 F.2d 115, 123 (4th Cir.1976). The underlying dispute must be subject to mandatory arbitration under the labor contract and the injunction must be necessary to "prevent arbitration from being rendered a meaningless ritual." *Local Lodge No. 1266 v. Panoramic Corp.*, 668 F.2d 276, 283 (7th Cir.1981). Of course, the injunction must also satisfy the traditional requirements of equity. *See Hoh v. Pepsico*, 491 F.2d at 561. In adopting this view, we are in agreement with the majority of the circuits that have addressed the issue. *See, e.g., Amoco Oil*, 885 F.2d at 702; *Independent Oil Workers v. Proctor & Gamble Mfg. Co.*, 864 F.2d 927, 930 (1st Cir.1988); *Nursing Home & Hosp. Union No. 434 v. Sky Vue Terrace, Inc.*, 759

F.2d 1094, 1098–99 (3d Cir.1985); *Aluminum Workers, Local Union No. 215 v. Consolidated Aluminum Corp.*, 696 F.2d 437, 441 (6th Cir.1982); *Panoramic Corp.*, 668 F.2d at 282–83; *Lever Brothers*, 554 F.2d at 123. *But see Amalgamated Transit Union, Div. 1384 v. Greyhound Lines*, 550 F.2d at 1238–39 (injunction may issue only if there is an express or implied-in-fact promise by employer to preserve the status quo pending arbitration).

■ The arbitration process is rendered meaningless only if any arbitral award in favor of the union would substantially fail to undo the harm occasioned by the lack of a status quo injunction. *See Ingalls Shipbuilding*, 906 F.2d at 152. In *Panoramic*, for example, the Seventh Circuit found that a company's plan to sell a division, if not enjoined, would render the process meaningless by presenting an arbitrator with a *fait accompli.* The purchaser had refused to recognize or bargain with the union, despite provisions in the collective bargaining contract arguably requiring that any purchaser must assume the obligations of the contract. The purchaser announced that it planned to terminate all employees, and any employee wishing to continue employment uould have to reapply. The court granted a status quo injunction pending arbitration of the union's dispute with the seller, reasoning that after the sale, the arbitrator would be left with "no certain and effective means of remedying the [alleged] breach of contract." 668 F.2d at 288.

The arbitral process is not rendered "meaningless," however, by the inability of an arbitrator to completely restore the status quo ante or by the existence of some interim damage that is irremediable. For example, as the Seventh Circuit recognized in *Panoramic*, when awaiting a decision from an arbitrator on a grievance, "an employee frequently suffers some injury that is not compensated by the contract remedies (in contrast to tort damages) typically awarded in arbitration." *Panoramic Corp.*, 668 F.2d at 285 n. 12; *cf. Consolidated Aluminum*, 696 F.2d at 444–45 ("repossessions, foreclosures, and injury to

credit status" resulting from discharges do not frustrate arbitral process so as to justify injunction). Rather, for an injunction to issue at the union's behest, the irremediable injury in question must be such as to threaten the integrity of the arbitration process itself.

We believe that the "frustration of arbitration" standard preserves the effectiveness of the arbitral process which the parties have agreed upon. By requiring more than a minimal showing of injury for the issuance of an injunction, the standard also guards against undue judicial interference with the employer's ability to make business decisions.

■ Independent of whether an injunction is available under the "frustration of arbitration" standard, we also hold that a union may obtain a status quo injunction where an employer has clearly violated an express promise to maintain the status quo pending arbitration or to refrain from using some method of self-help, where the dispute is arbitrable and the traditional requirements of equity, including irreparable harm, have been satisfied. *See Gulf Coast Industrial Workers' Union v. Exxon Co.*, 712 F.2d 161, 164–65 (5th Cir.1983); *Ingalls Shipbuilding*, 906 F.2d at 152.

We do not read the *Boys Markets/Buffalo Forge* exception to *require* a union seeking an injunction to show an express promise. Where one is shown, however, the union should be able to enforce it. This does no more than accord the union the benefit of its bargain regarding dispute resolution in the workplace. Following *Boys Markets*, this "merely enforces the obligation ... freely under[taken] under a specifically enforceable agreement to submit disputes to arbitration." *Boys Markets*, 398 U.S. at 252–53, 90 S.Ct. at 1593–94 (footnote omitted); *see also id.*, 398 U.S. at 248, 90 S.Ct. at 1591. *But see Panoramic*, 668 F.2d at 282.

With the foregoing principles in mind, we turn to the district court's decision to enjoin Oxychem's implementation of the random drug testing program pending arbitration. The district court found that because an arbitrator could not remedy the inva-

sions of privacy inherent in the random testing program, the arbitral process would be "frustrated" absent a preliminary injunction preserving the status quo. The district court also based its decision on the zipper clause, which it found represented a promise by the employer to maintain the status quo, "elevat[ing] a unilateral departure from the [CBA]'s terms ... to a violation of the bargaining process itself and not merely a dispute over interpretation." We disagree with the district court.

### A. *Frustration of Arbitration*

In our view, the district court's conclusion that Oxychem's action frustrates the arbitration process is in error. We do not believe that the arbitrator is so unable to grant effective relief as to render the arbitral process a "hollow formality," if drug testing proceeds pending arbitration. First, the arbitrator may order reinstatement and backpay for an employee who is discharged or disciplined as a result of a false positive test result. While there may be interim damage to the reputation of such an employee, it is no different that that sustained by an employee who has been discharged in violation of any provision of a collective bargaining contract and is later reinstated. Such harm, although real, is generally insufficient to enjoin the employer from discharging the employee who, say, is accused of breaking work rules, embezzling, or being incompetent, pending arbitration of those charges. *See Ingalls Shipbuilding,* 906 F.2d at 153; *accord Utility Workers of Am., Local No. 246 v. Southern Calif. Edison Co.,* 852 F.2d 1083, 1088 (9th Cir.1988), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1530, 103 L.Ed.2d 835 (1989).

We also disagree with the Union that the process of drug testing itself, that is, the production of the urine sample and its testing, irreparably harms employees by invading their privacy. The Union argues that all employees tested under the program will suffer this loss, not simply those who falsely test positive, and that an arbitrator cannot effectively redress this loss of privacy after the fact.

We are not unsympathetic to the possibility that employees may be humiliated or stigmatized by having to produce urine and allow it to be tested. *Cf. Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989) (finding privacy interests where government regulations require urine testing). Nonetheless, this possibility of harm does not so disable the arbitrator from rendering relief as to justify a status quo injunction. First, the protocols used in the random drug testing program, including the methods of monitoring the urine sample's production and testing, have already been accepted by the Union for use in the reasonable suspicion program. This undermines the Union's claim here that the random drug testing program is a grievous invasion of privacy. Second, the Union conceded at oral argument that the production of urine samples is not monitored, either visually or aurally, unless there is reason to believe that a previous urine sample has been tampered with. Based on the undisputed record, we decline to conclude, as a matter of law, that the likelihood of invasion of privacy of the employees is so great as to render the arbitral process "meaningless." *Accord Ingalls Shipbuilding,* 906 F.2d at 153.

In so ruling, we are in disagreement with the Tenth Circuit's holding in *Amoco Oil.* That court affirmed the issuance of a preliminary injunction against the unilateral implementation of a drug testing program. In finding the invasion of privacy sufficient to warrant the injunction, the court used a "wide focus in assessing the nature of the threatened injury." 885 F.2d at 709. We agree with the dissent that such a "wide focus" is inappropriate in the context of preserving the arbitral process. Because we conclude that Oxychem's interim implementation of the drug testing program does not frustrate the arbitral process or render it futile, it does not justify a *Boys Markets/Buffalo Forge* injunction.

### B. *Promise to Maintain the Status Quo*

Finally, the Union argues that the preliminary injunction against the drug

testing program must be affirmed, because it enforces an express promise made by the employer to maintain the status quo embodied in the zipper clause.

We reject the Union's argument. First, the language of the zipper clause does not transparently communicate Oxychem's intent (if such an intent is present) to refrain from self-help or to maintain the status quo. Rather, the clause states that neither party may request the other to negotiate on any subject for the duration of the agreement, whether or not the subject is contained in the CBA.

The Union maintains that the zipper clause modifies the relations between the parties, however, with the ultimate effect of barring Oxychem from making *any* unilateral changes for the duration of the CBA. Absent a zipper clause, the Union contends, Oxychem would first have to demand that the union bargain over the proposed change, and then, if the two bargained to impasse, Oxychem could unilaterally implement that change. Since the zipper clause waives Oxychem's right to demand such bargaining, the Union contends, impasse can never be reached and the change never implemented. Oxychem counters, however, that the drug testing program is a safety rule. As a safety rule, the drug program would be reserved to Oxychem's discretion under the management clause, not covered by the zipper clause.

The Union's request for an injunction based on the zipper clause would require the court to decide whether the drug program is a subject covered by that clause. *Cf. International Union, U.A.W. v. N.L. R.B.*, 765 F.2d 175, 180 (D.C.Cir.1985). Such a decision would clearly usurp the arbitrator's function, impeding, rather than assisting, the agreed-upon dispute resolution process. Because the parties "have not contracted for a judicial preview of the facts and the law," *Buffalo Forge*, 428 U.S. at 411, 96 S.Ct. at 3149, we decline to speculate on the application of the zipper clause (or the management rights clause) to this case. We leave the merits of that dispute to the arbitrator.

Our ruling on this issue is consistent with *Buffalo Forge*, in which the Supreme Court declined to enjoin a sympathy strike, in part on the grounds that the application of the no-strike clause was unclear. The Supreme Court reasoned that a judicial interpretation of the no-strike clause—required if an injunction were to be issued—would invade the province of the arbitrator.

We conclude that the preliminary injunction issued by the district court does not fall within the the the *Boys Markets/Buffalo Forge* exception to the NLGA. Accordingly, we reverse the district court decision without reaching Oxychem's other arguments.

Injunction vacated.