230 F.3d 569 (2nd Cir. 2000)
 AERONAUTICAL INDUSTRIAL DISTRICT LODGE 91 of the INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, Plaintiff-Appellee,
v.
UNITED TECHNOLOGIES CORPORATION, PRATT & WHITNEY, Defendant-Appellant.
 No. 00-7168
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued May 12, 2000,
Decided October 26, 2000,
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 JOEL H. KAPLAN, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL (Gary S. Kaplan, Seyfarth, Shaw, Fairweather & Geraldson; and Gary L. Lieber, Henry A. Platt, Schmeltzer, Aptaker & Shepard, P.C., Washington, DC, on the brief) for Defendant-Appellant.
 GREGG D. ADLER, Livingston, Adler, Pulda & Meiklejohn, P.C., Hartford, CT (Mary E. Kelly, Livingston, Adler, Pulda & Meiklejohn, P.C.; and Jonathan P. Hiatt, James B. Coppess, AFL-CIO, Washington, DC, on the brief) for Plaintiff-Appellee.
 Richard Blumenthal, Attorney General of Connecticut, Charles A. Overend, Thomas P. Clifford, III, and Richard T. Sponzo, Assistant Attorneys General, Hartford, CT for Amicus Curiae the State of Connecticut.
 Before: WALKER, Chief Judge, KEARSE and CARDAMONE, Circuit Judges.
 JOHN M. WALKER, JR., Chief Judge:
 
 
 1
 Defendant-appellant United Technologies Corporation, Pratt & Whitney Division (hereinafter "Pratt" or "the Company") appeals from two decisions of the United States District Court for the District of Connecticut (Janet C. Hall, District Judge): (1) the January 6, 2000, denial of the Company's motion to dismiss the claim by plaintiff-appellee Aeronautical Industrial District Lodge 91 (hereinafter "the Union") that Pratt's proposed transfer of certain work outside the bargaining unit would violate the collective bargaining agreement, see Aeronautical Indus. Dist. Lodge 91 v. United Tech. Corp., Civ. A. No. 3:99-CV-1827 (JCH) (D. Conn. Jan. 6, 2000) (order denying motion to dismiss) ("Aeronautical I"); and (2) the February 18, 2000, opinion and order prohibiting the Company from transferring such work until it makes every reasonable effort to preserve work within the unit, see Aeronautical Indus. Dist. Lodge 91 v. United Tech. Corp., 87 F. Supp. 2d 116 (D. Conn. 2000) ("Aeronautical II").
 
 
 2
 We conclude that: (1) the district court had subject matter jurisdiction to entertain the Union's suit; (2) the "every effort" clause in the collective bargaining agreement constitutes an enforceable obligation that the Company failed to meet; and (3) notwithstanding the general limits on the power of federal courts to issue injunctions in labor disputes, the district court had jurisdiction to issue an injunction against the Company under the circumstances of this case. Accordingly, we affirm Judge Hall's orders denying the Company's motion to dismiss and subsequently enjoining the Company from transferring certain work outside the bargaining unit until it makes every reasonable effort to preserve that work within the unit.
 
 BACKGROUND
 
 3
 In 1998, the Union and the Company entered into their current collective bargaining agreement ("CBA"), which covers several thousand production and maintenance employees in Connecticut for the period October 8, 1998 through December 2, 2001. The CBA contains several provisions relevant to this case:
 
 
 4
 Article 1 provides that "the Company has and will retain the sole right and responsibility to direct the operations of the Company and in this connection to determine the number and location of its plants . . . [and] the assignment of all work to employees or other persons . . . unless otherwise hereinafter provided." Article 27 provides that the Company will give the Union six months' "notice of its intent to close a plant or transfer . . . any part of an operation" and will "meet and confer" with the Union concerning any such decision, but that "the final decision regarding closing a plant or transferring a business unit rests solely with the Company." Article 7 provides for arbitration of disputes but expressly exempts disputes arising under Articles 1 and 27.
 
 
 5
 In addition, the CBA incorporates various letters of agreement, including Letter 22, which provides in relevant part:
 
 
 6
 The Company agrees during the life of this Agreement that it will continue to employ bargaining unit members at its facilities in [various Connecticut locations]. The Company will make every effort to preserve the work presently and normally manufactured by employees covered by Article 2 of this Agreement. Therefore, it is not the intent of the Company to use subcontractors for the purpose of reducing or transferring work that is presently and normally manufactured by employees in the bargaining unit nor to place such work in Maine or Georgia . . . . Any disputes concerning workplace guarantees and subcontracting are not subject to the grievance procedure including arbitration. If a difference arises over [such issues], it will be referred to and discussed by the Executive Steering Committee [composed of high-level Union and Company representatives] at their next regularly scheduled meeting.
 
 
 7
 Several aspects of the parties' collective bargaining history during the 1990s are relevant to this appeal. In 1991, the parties added Article 27 to the contract, but the Company insisted that decisions under that article be non-arbitrable. In emergency negotiations in 1993, the parties agreed to language concerning workplace guarantees and subcontracting. Representatives of the Company insisted that disputes arising under these provisions be non-arbitrable, but in return assured Union officials that the Union had "other avenues" for enforcing these provisions. In 1995, the parties adopted Letter 23, the predecessor to the current Letter 22, whose provisions were based largely on earlier proposals and language concerning job security. Finally, in 1998, the parties reenacted the provisions of Letter 23 as Letter 22 without making any changes relevant to this lawsuit. At the same time, the Company rejected the Union's proposal that decisions under Letter 22 be made arbitrable.
 
 
 8
 In August 1999, Pratt announced that it was implementing a major restructuring that would include the permanent transfer of production work related to the repair of aircraft engine parts from Company facilities in North Haven and East Hartford, Connecticut, to facilities in Texas, Oklahoma, and Arkansas. The Company sought to "eliminate excess floor space, reduce costs and streamline operations" and thereby reduce its perceived competitive cost disadvantage. At the time of the announcement, this repair work was being performed by 507 bargaining unit employees working in Pratt's facilities in North Haven and East Hartford. The Union invoked the "meet and confer" provisions of Article 27, but Pratt refused to change its decision.
 
 
 9
 On September 16, 1999, the Union filed the instant action pursuant to 301 of the Labor Management Relations Act, 29 U.S.C. 185, seeking an injunction and a declaration that the proposed transfer violated the CBA. The Company filed a motion to dismiss. On January 6, 2000, Judge Hall denied the motion, holding primarily that: (1) the court had subject matter jurisdiction to resolve this work-transfer dispute; and (2) the court had the power to provide injunctive relief. See Aeronautical I, slip op. at 20, 28. A bench trial was held on January 10 and 14.
 
 
 10
 On February 18, 2000, Judge Hall issued an opinion and order in which she: (1) held that the Company's plan to transfer work out of Connecticut violated the CBA because Letter 22 imposed a contractual obligation to make every effort to preserve the work done by Union members and the Company had not met this obligation; and (2) entered a permanent injunction prohibiting the Company from transferring bargaining unit work out of state during the life of the current CBA "unless and until Pratt makes every reasonable effort to preserve that work within the . . . bargaining unit." Aeronautical II, 87 F. Supp. 2d at 136. This appeal followed.
 
 
 11
 Both the district court and a prior panel of this court denied the Company's motion to stay the injunction pending appeal. Before this panel, Pratt has renewed its motion for a stay of the injunction and has requested in the alternative a limited stay to allow the relocation of certain bargaining unit work to Oklahoma for several months while a substantial piece of machinery is transferred from one Connecticut plant to another. The Union opposes this motion.
 
 DISCUSSION
 I. Subject Matter Jurisdiction
 
 12
 Initially, we must determine whether the district court had subject matter jurisdiction over this dispute concerning the transfer of bargaining unit work to Company facilities outside of Connecticut. We conclude that the district court did, indeed, have jurisdiction.
 
 
 13
 Although there is a presumption under 301 favoring access to a judicial forum to resolve disputes involving the application and interpretation of CBAs, that presumption "is overcome whenever the parties have agreed upon a different method for the adjustment of their disputes." Groves v. Ring Screw Works, 498 U.S. 168, 173-74, 112 L. Ed. 2d 508, 111 S. Ct. 498 (1990). Any form of "'final adjustment by a method agreed upon by the parties'" must be given full effect by the courts. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 562, 47 L. Ed. 2d 231, 96 S. Ct. 1048 (1976) (quoting 29 U.S.C. 173 (d)); see also Standard Food Prods. Corp. v. Brandenburg, 436 F.2d 964, 966 (2d Cir. 1970) ("The court has no power to disregard their contract and force other methods upon them.").
 
 
 14
 At the same time, a contractual agreement to preclude judicial participation in the resolution of important labor-management disputes must be clear in order to be enforced. See Groves, 498 U.S. at 174-76. Thus, a district court has jurisdiction to review an arbitration award where the CBA does not expressly provide that the arbitration is "final and binding" or the equivalent, see Orlando v. Interstate Container Corp., 100 F.3d 296, 301 (3d Cir. 1996), but lacks jurisdiction where the CBA so states, see Alford v. General Motors Corp., 926 F.2d 528, 531 (6th Cir. 1991).
 
 
 15
 According to Pratt, no judicial review is available because: (1) the work transfer in dispute implicates only Article 27, not Letter 22 -- since it does not involve work guarantees or subcontracting -- and Article 27 makes clear that "final" decisions rest "solely" in the Company's discretion; and (2) even if Letter 22 applies, the parties agreed that disputes under that provision would be submitted to the Executive Steering Committee ("ESC") for final resolution. We disagree.
 
 
 16
 First, at least on its face, Letter 22 plainly applies to disputes, like this one, over the preservation of bargaining unit work. Second, the parties have not clearly precluded judicial resolution of disputes that arise under Letter 22. Letter 22 provides that any such disputes are subject to discussions by the ESC, with no clear indication that this method is meant to be final and binding, and thus judicial review is presumptively available. Both parties agree that disputes under Letter 22 are not subject to final arbitration, which would strip the courts of jurisdiction. Rather, during negotiations, Pratt representatives assured the Union that it could resort to "other avenues" besides arbitration to enforce Letter 22, and such avenues would plausibly include judicial remedies.
 
 
 17
 Accordingly, the district court properly concluded that it had subject matter jurisdiction over this dispute.
 
 
 18
 II. Interpretation of the "Every Effort" Clause
 
 
 19
 Pratt argues that the district court erred in interpreting the CBA when it found that Letter 22 imposed an enforceable obligation on the Company -- to make "every effort" to preserve bargaining unit work -- that Pratt had failed to fulfill in this case. With some limited caveats, we conclude that Judge Hall's interpretation of the agreement was correct as a matter of law.
 
 
 20
 When courts interpret CBAs, traditional rules of contract interpretation apply as long as they are consistent with federal labor policies. See Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Constr. Co., 932 F.2d 1443, 1448 (11th Cir. 1991). When provisions in the agreement are unambiguous, they must be given effect as written. See Bozetarnik v. Mahland, 195 F.3d 77, 83 (2d Cir. 1999). Only when provisions are ambiguous may courts look to extrinsic factors -- such as bargaining history, past practices, and other provisions in the CBA -- to interpret the language in question. See United Mine Workers v. LTV Steel Co. (In re Chateaugay Corp.), 891 F.2d 1034, 1038 (2d Cir. 1989). In addition, as with all contracts, courts should attempt to read CBAs in such a way that no language is rendered superfluous. See United States v. IBT, 970 F.2d 1132, 1136 (2d Cir. 1992).
 
 
 21
 The district court concluded that "the terms of Letter 22 are clear and unambiguous," Aeronautical II, 87 F. Supp. 2d at 129, and imposed an enforceable obligation on the Company to make "any and all earnest attempts that are reasonably possible to preserve the work that is normally and presently manufactured" by bargaining unit members, id. at 131. According to the district court, only this reading would "give effect to all the provisions [of Letter 22], render them consistent, and make no one provision superfluous." Id. at 130. In addition, the district court found that the "every effort" clause was sufficiently definite to be enforceable and that Pratt had failed to meet the obligation imposed by this clause under the circumstances of this case. See id. at 131-32.
 
 
 22
 The Company has raised four principal objections to the district court's rulings: (1) the district court's interpretation of the "every effort" clause is erroneous as a matter of law; (2) the bargaining history of the parties demonstrates that this interpretation is flawed; (3) the "every effort" clause is too vague to constitute an enforceable promise; and (4) even if the clause imposes such an obligation, the Union has failed to prove that the Company actually violated this obligation. None of these objections is ultimately availing.
 
 
 23
 We see only two plausible interpretations of the crucial paragraph in Letter 22: (1) the "every effort" sentence imposes an enforceable obligation on the Company, while the "therefore" sentence simply provides examples of how Pratt likely might fulfill this obligation, as the district court concluded; or (2) the "every effort" sentence is a general proposition whose specific and enforceable content is defined exclusively by the "therefore" sentence, as Pratt argues.
 
 
 24
 We agree with the district court that only the first interpretation gives meaning to the entire paragraph. See Aeronautical II, 87 F. Supp. 2d at 130. Contrary to Pratt's contentions, the district court's reading of the "therefore" sentence -- as illustrative of what Pratt would not do given its obligation to preserve certain bargaining unit work -- makes sense and does not render it meaningless. The Company's interpretation, by contrast, renders the "every effort" sentence superfluous by reducing the paragraph to an understanding, informed by only the "therefore" sentence, that the Company intends to preserve bargaining unit work in certain limited respects, but without any explicit promises.
 
 
 25
 At the same time, contrary to the district court, we believe that extrinsic factorsare relevant to determining the precise nature of the Company's duties under Letter 22 because the contested contractual language is not unambiguous on its face. At a minimum, the "every effort" clause is ambiguous because it refers to work "manufactured" by members of the bargaining unit, thereby raising the possibility that the parties had in mind only the manufacturing work performed by union workers, not the repair work at issue here.
 
 
 26
 After reviewing the parties' bargaining history and the other provisions of their contract, we discern no intention to distinguish between manufacturing and repair work in this fashion. But we do see several facts that raise concerns about the district court's interpretation of Letter 22: (1) the parties unambiguously agreed in Article 27 that ultimate decisions regarding work transfers lie with the Company and cannot be appealed; (2) the Company has repeatedly rebuffed the Union's efforts to subject decisions under Letter 22 (or comparable provisions) to arbitration; and (3) the relevant language in Letter 22 appears to have been taken from provisions concerning only subcontracting or work transfers to Maine or Georgia, neither of which is present in this case.
 
 
 27
 Nevertheless, these facts -- on which the Company relies heavily -- do not undermine the district court's reading. First, even under an expansive interpretation of Letter 22, the Company retains final say over work transfer decisions, subject only to judicial review of whether it made "every effort" to preserve bargaining unit work in the process. See Aeronautical II, 87 F. Supp. 2d at 126. In this way, Letter 22 and Article 27 can sensibly be read together to give meaning to both provisions. While Article 27 posits that any final determination will be made by the Company, Letter 22, if it is to be accorded any meaning at all, places enforceable burdens on the Company to try to accommodate the Union's concerns. Second, as discussed above, Letter 22 makes no provision for final resolution of disputes arising thereunder, and therefore is consistent with the Company's view that no arbitration is permitted, thus leaving open the possibility of litigation. See supra Part I. Third, the bargaining history is ambiguous as to the precise scope of the obligation. The current provision draws not only on language about subcontracting and work transfers to Maine and Georgia, but also on language about maintaining certain work in Connecticut and about job security more generally, both of which are implicated in this case.
 
 
 28
 The bargaining history also further reinforces our confidence in the district court's reading of the text of Letter 22. It is readily apparent from the parties' negotiations that, with regard to Letter 22, they contemplated something more substantial than a simple expression of good intent. When the work guarantee and subcontracting provisions were first adopted in 1993, the Union made substantial economic concessions and was given assurances that it had "other avenues" available besides arbitration should disputes arise under these provisions. Although the job security provisions have been modified over the ensuing years to give the Company somewhat more discretion, even these changes support the district court's reading. Whereas the 1993 version provided that Pratt "will take no action" to subcontract or transfer certain work, the 1995 version added the "every effort" clause and then stated that "it is not the intent of the Company" to do those things. The replacement of mandatory with permissive language suggests to us that the second sentence is an illustration of what the new first sentence means (as the district court concluded) rather than an independent statement of the scope of the Company's duties (as Pratt insists).
 
 
 29
 We are also persuaded that the "every effort" obligation is sufficiently definite to constitute an enforceable promise. See Aeronautical II, 87 F. Supp. 2d at 131 (citing cases). The cases cited by the Company establish only that an obligation of this nature standing alone is insufficient to create an enforceable contract -- not that such language, when part of an admittedly enforceable contract, cannot be given sufficiently definite content. See id. In fact, courts and arbitrators interpreting similar phrases have determined, like the district court here, that they impose an obligation to make all reasonable efforts to reach the identified end. See Collier v. Metropolitan St. Louis Sewer Dist., 706 S.W.2d 894, 897 (Mo. Ct. App. 1986); Shandy v. Portland Sch. Dist. No. 1, 54 Ore. App. 420, 634 P.2d 1377, 1381 (Or. Ct. App. 1981); Troy Sch. Dist., 113 Lab. Arb. (BNA) 583, 587 (1999) (Allen, Arb.). Consequently, the district court's conclusion that the "every effort" clause imposes an obligation on the Company to make "every reasonable effort" to preserve bargaining unit work, Aeronautical II, 87 F. Supp. 2d at 136, is a sound reading of the contractual language, not an inappropriate modification of that language, as Pratt contends.
 
 
 30
 Finally, we must determine whether the Company has made every reasonable effort to preserve bargaining unit work. Although on its face this review of Pratt's behavior seems to involve the federal courts in second-guessing decisions that are uniquely within an employer's expertise, like work transfers, in fact the task is a familiar one to us. Courts are frequently called upon to determine whether decisions by private actors, including businesses, constituted their "best efforts" or were "reasonable" or undertaken "in good faith."
 
 
 31
 Based on cases interpreting "best efforts" language in other contexts, we think Pratt must "actively" and "in good faith" pursue the goal of maintaining bargaining unit work. Western Geophysical Co. v. Bolt Assocs., 584 F.2d 1164, 1171 (2d Cir. 1978). While it may certainly "give reasonable consideration to its own interests" and need not "spend itself into bankruptcy" in order to achieve the contractually mandated goal, Bloor v. Falstaff Brewing Corp., 601 F.2d 609, 614 (2d Cir. 1979), it may not pursue its own profit "without fair consideration of the effect," id., on bargaining unit work. In other words, Pratt must "at least . . . explore whether steps not involving substantial losses could have been taken" to avoid or "at least lessen" the negative impact on bargaining unit work. Id. at 613-14. However, we do not suggest that it is necessary, as the district court found, see Aeronautical II, 87 F. Supp. 2d at 126, for Pratt to accept significantly lower profits, or even losses, before transferring work.
 
 
 32
 Under our interpretation of "every effort," Pratt has not met the obligation imposed by Letter 22. Robert Weiner, the Vice-President of Engine Services, testified that "no[] practical effort" was made to preserve bargaining unit work. And although the Company considered several options that included keeping the work in Connecticut, the only factors it admittedly took into account were cost savings and risk. Thus, while Pratt weighed a number of financially reasonable options, including some that retained much of the now-threatened bargaining unit work, it did not assign any extra value in its decision-making to choices that preserved such work. In addition, the Company apparently failed to explore other potentially available means of cutting costs without transferring work, such as seeking relief from the State or the Union. In sum, the Union has made a sufficient showing to satisfy its initial burden that Pratt "was content to allow" bargaining unit work to be transferred elsewhere as long as this course of action was best for Pratt's "overall profit picture." Bloor, 601 F.2d at 614. The burden then shifted to Pratt to show there was "nothing significant it could have done" to preserve bargaining unit work that would not have entailed serious financial consequences. Id. at 614-15. Pratt has not shown that alternatives less drastic than the transfer as proposed would have had such consequences and therefore has failed to meet its burden.
 
 
 33
 We will not attempt to delineate with precision what actions would fulfill the Company's obligation to make all reasonable efforts to preserve bargaining unit work. Nevertheless, we believe that, consistent with the foregoing analysis, indications that the Company has made serious efforts might include: (1) a weighing of restructuring options that explicitly took workforce preservation into account as a separate and important value; (2) good-faith pursuit of reasonable concessions from the Union or the State that would reduce or eliminate the financial need to transfer work out of Connecticut; and (3) a showing that transferring less than the planned amount of work out of Connecticut would entail serious financial consequences.
 
 
 34
 On the current record, however, the district court plainly did not err in concluding that Pratt had an enforceable obligation to make "every effort" to preserve bargaining unit work and that it had failed to fulfill its duty in this case.
 
 III. Jurisdiction to Issue Injunction
 
 35
 Finally, we must decide whether the district court had jurisdiction to issue an injunction as a remedy for the Company's failure to meet its contractual "every effort" obligation. We conclude that the district court acted within its powers in enjoining Pratt from proceeding with its restructuring plans despite the general prohibitions in the Norris-LaGuardia Act ("NLA"), 29 U.S.C. 101 et seq., against issuing injunctions in labor disputes.
 
 
 36
 As the district court noted, this case seems at first blush to present a direct conflict between the judicial enforcement of CBAs authorized by 301 -- interpreted by courts to include injunctions -- and the anti-injunction provisions of the NLA. The NLA, passed in 1932 largely to protect employees' ability to organize and bargain collectively, see Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n, 457 U.S. 702, 708, 73 L. Ed. 2d 327, 102 S. Ct. 2672 (1982), contains a broad prohibition against injunctions in labor disputes:
 
 
 37
 No court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.
 
 
 38
 29 U.S.C. 101 (" 1"). Other provisions of the NLA enumerate "specific acts not subject to restraining orders or injunctions," including strikes, unionizing, picketing, and refusing to remain in an employment relationship, id. 104 (" 4"), and establish that certain procedural requirements must be met before an injunction may issue in a labor dispute, see id. 107 (" 7").
 
 
 39
 Section 301, passed in 1947 as part of the Labor Management Relations Act ("LMRA"), provides without limitation that "suits for violation of contracts between an employer and a labor organization . . . may be brought in any district court of the United States having jurisdiction of the parties." 29 U.S.C. 185(a). Various courts have concluded that 301 authorizes federal courts to issue injunctions to enforce CBAs. See Drywall Tapers & Pointers v. Operative Plasterers' & Cement Masons' Int'l Ass'n, 537 F.2d 669, 673-74 (2d Cir. 1976); International Union v. Mack Trucks, Inc., 820 F.2d 91, 97 (3d Cir. 1987); Local 2750, Lumber & Sawmill Workers Union v. Cole, 663 F.2d 983, 984 (9th Cir. 1981). Indeed, the legislative history suggests that Congress intended that all conventional judicial remedies would be available in 301 suits. See Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 207, 8 L. Ed. 2d 440, 82 S. Ct. 1328 (1962), overruled on other grounds by Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 26 L. Ed. 2d 199, 90 S. Ct. 1583 (1970).
 
 
 40
 Despite this apparent conflict, the two statutes have been accommodated by judicial decisions holding that 301 empowers the federal courts to enforce CBAs by injunction only in cases not specifically covered by the NLA, provided judicial relief is otherwise appropriate. The decisions of both the Supreme Court and this court suggest that injunctive relief is permitted under circumstances that do not implicate the abuses the NLA was enacted to prevent. In Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 1 L. Ed. 2d 972, 77 S. Ct. 912 (1957), the Court held that an injunction could issue to compel arbitration of grievance disputes despite the prohibitions of the NLA, largely because "failure to arbitrate was not a part and parcel of the abuses against which the [NLA] was aimed" and was not listed in 4 as one of the "kinds of acts which had given rise to abuse of the power to enjoin." Id. at 457-58. Similarly, we have held that where the conduct sought to be enjoined "does not fall within the specific provisions of the [NLA], the district court has jurisdiction to grant injunctive relief." Drywall Tapers, 537 F.2d at 674; see also National Ass'n of Letter Carriers v. Sombrotto, 449 F.2d 915, 919 (2d Cir. 1971) ("Section 4 restricts the federal court's jurisdiction only in certain specified instances, particularly with regard to the enjoining of strikes . . . ."). Under this reasoning, despite the NLA's broad prohibition as a textual matter, a court may nonetheless issue an injunction in a labor dispute against conduct not specifically enumerated in 4 or otherwise related to the abuses that motivated the NLA in the first place.
 
 
 41
 This is not to say that injunctions may always issue in such cases. In addition, judicial relief must be appropriate under the circumstances. As discussed above, see supra Part I, judicial remedies (including injunctions) are generally not available where the parties have agreed to a final and binding alternative method of dispute resolution, typically arbitration. See Buffalo Forge Co. v. United Steelworkers, 428 U.S. 397, 411-12, 49 L. Ed. 2d 1022, 96 S. Ct. 3141 (1976). Thus, it is normally inappropriate for federal courts to issue preliminary injunctions pending the arbitration of arbitrable disputes. But see infra (discussing exceptions to this rule).
 
 
 42
 In sum, where a case does not concern either conduct enumerated in 4 or a dispute subject to mandatory arbitration, the proper approach is to allow injunctive relief provided the policies of both 301 and the NLA are thereby advanced. Cf. Boys Markets, 398 U.S. at 250 (suggesting that the two statutes must be interpreted in a fashion that satisfies both of their purposes). In this case, the Union sought to enjoin conduct -- the transfer of work -- not included in 4; its grievance under Letter 22 was not arbitrable; and the injunction ordered by the district court promoted important purposes of both 301 (to enforce CBAs, see Niagara Hooker Employees Union v. Occidental Chem. Corp., 935 F.2d 1370, 1375 (2d Cir. 1991)) and the NLA (to protect workers' rights of self-organization, see 29 U.S.C. 102). Thus, the district court acted appropriately and within its powers in ordering injunctive relief under the circumstances. See Aeronautical I, slip op. at 17-19.
 
 
 43
 In opposition to this conclusion, the Company insists that judicial decisions in this area reconcile 301 and the NLA in a manner far more restrictive of the injunctive power of the federal courts. Relying on the exceptions to the NLA that courts have recognized in order to promote the arbitration process, Pratt argues that an injunction may issue in a labor dispute only where the underlying dispute is subject to mandatory arbitration and the injunction is necessary to prevent the arbitration process from being undermined. But this argument rests on a fundamental misreading of the cases establishing the arbitration exceptions. These cases do not define the entire universe of situations in which courts may issue injunctions in labor disputes. Rather, they carve out limited exceptions to the general rule that an injunction may issue only where the dispute is subject to judicial resolution and the conduct to be enjoined is not included within the letter or spirit of 4 of the NLA.
 
 
 44
 First, under the "Boys Markets exception," employers may obtain injunctions against strikes pending arbitration of labor disputes where the CBA contains a no-strike clause and the strike concerns a dispute subject to mandatory arbitration. See Buffalo Forge, 428 U.S. at 408-10; Boys Markets, 398 U.S. at 237-38.
 
 
 45
 Contrary to Pratt's reading, these cases do not establish that injunctions may issue only in the context of arbitrable disputes. Rather, they imply that the defense of arbitration is important enough to allow courts to enjoin even conduct specifically enumerated in 4, i.e., strikes. Pratt points to the Supreme Court's pronouncement that, "aside from the enforcement of . . . arbitration provisions . . . within the limits permitted by Boys Markets, the Court has never indicated that the courts may enjoin actual or threatened contract violations despite the [NLA]." Buffalo Forge, 428 U.S. at 409. But taken in context, this statement implies that only the goal of protecting arbitration is important enough to merit this exception to the express prohibitions of 4 -- it does not speak to injunctions against conduct not covered by 4.
 
 
 46
 Second, many lower federal courts, including this one, have recognized the "reverse Boys Markets exception," which permits unions to obtain injunctions against employers to preserve the status quo pending arbitration of a labor dispute as long as: (1) the underlying dispute is subject to mandatory arbitration; and (2) the injunction is necessary to prevent the arbitration process from becoming a "hollow formality" or "meaningless ritual." Niagara Hooker, 935 F.2d at 1377 (internal quotation marks omitted).
 
 
 47
 The Company argues that Niagara Hooker establishes that injunctions in labor disputes may be issued only in aid of arbitration. This is plainly an overstatement of the law and of our holding in that case. Niagara Hooker's focus was not all conceivable labor disputes, but only those concerning arbitrable issues. Where a grievance is subject to arbitration, it is generally inappropriate for a federal court to intervene, see Buffalo Forge, 428 U.S. at 411-12, except to compel the parties to submit to arbitration, see Lincoln Mills, 353 U.S. at 457-58. While judicial relief is typically unavailable under those circumstances, Niagara Hooker establishes that an injunction may nonetheless issue where required to defend the integrity and effectiveness of the arbitration process itself. See 935 F.2d at 1377. This analysis is wholly inapplicable to a case, like this one, in which the labor dispute concerns non-arbitrable issues. Where a grievance is not subject to arbitration or any other final and binding dispute resolution procedure, litigation is presumptively available under 301, and courts may issue injunctions consistently with the provisions of the NLA, as interpreted above.
 
 
 48
 Therefore, we reject the Company's erroneous interpretation of the scope of the Boys Markets and the reverse Boys Markets jurisprudence and affirm the district court's determination that it had the power to issue an injunction in this case.
 
 
 49
 Finally, the Company raises two other issues that merit attention, but not reversal. First, Pratt complains that the district court improperly excused the Union from some of the procedural requirements that must be met under 7 of the NLA in order for an injunction to issue. See Aeronautical I, slip op. at 20-21. In particular, the district court did not require the Union to demonstrate a threat of "unlawful acts" by the Company, which the Union could not have shown on these facts. But the case law plainly supports the district court's determination that only relevant procedural requirements need to be met "in cases where courts have accommodated the conflicting purposes of the NLA and the LMRA." Id. at 20; see Lincoln Mills, 353 U.S. at 458-59 (excusing the requirements of 7 because "the congressional policy in favor of the enforcement of agreements to arbitrate" is clear); Drywall Tapers, 537 F.2d at 674 (requirements are met provided the district court heard "all facts and arguments deemed important by the parties"); Hoh v. Pepsico, Inc., 491 F.2d 556, 560 (2d Cir. 1974) (finding that 7 remains applicable in a Boys Markets-type case, but only "so far as consistent with the policies of 301"). While the requirements that the court hear evidence and balance hardships prior to issuing an injunction are relevant in a 301 case, see Hoh, 491 F.2d at 560, the requirement that the court find a threat of "unlawful acts" is generally not. Section 301 authorizes suits for breach of CBAs, and such a breach need not, and in most cases will not, entail any unlawful conduct.
 
 
 50
 Second, the Company contends that the enjoined conduct was, in fact, covered by the literal terms of 4, and thus the injunction was prohibited by the NLA. The injunction, Pratt argues, prohibited it from "refusing . . . to remain in any relation of employment" under 29 U.S.C. 104(a) because it was required to continue to use bargaining unit employees to perform the work it wanted to transfer outside of Connecticut. This argument is not persuasive. The Company essentially conceded below that 4 did not literally apply to the actions the Union sought to enjoin. Even assuming Pratt's current argument was not thereby waived, we believe the order in this case relates to the transfer of work, not to the retention of any particular employment relationship, and therefore does not implicate 4 directly. Moreover, it is well established that federal courts may order reinstatement -- or in other words, enjoin employers from terminating employment relationships -- in 301 suits consistently with the provisions of the NLA. See Seymour v. Olin Corp., 666 F.2d 202, 211 (5th Cir. Unit B 1982); Cole, 663 F.2d at 984.
 
 CONCLUSION
 
 51
 For the foregoing reasons, we conclude that: (1) the district court had subject matter jurisdiction over the Union's suit; (2) the "every effort" clause in the parties' CBA imposes an enforceable obligation that the Company failed to meet; and (3) notwithstanding limits on the power of federal courts to issue injunctions in labor disputes, the district court acted within its powers in issuing an injunction against the Company in this case. Accordingly, we affirm the district court's orders denying the Company's motion to dismiss and enjoining the Company from transferring certain work outside the bargaining unit until it makes every reasonable effort to preserve that work within the unit or until the CBA expires in December of 2001. In addition, we deny the appellant's motions to stay the injunction as moot.